United States District Court
Southern District of Texas
**ENTERED**
March 17, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH ANDREW PRYSTASH, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  H-05-1546 |
| | § | |
| WILLIAM STEPHENS, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

In 1996, a jury convicted Petitioner Joseph Andrew Prystash of capital murder and answered Texas's special issue questions in a manner requiring the imposition of a death sentence.  After unsuccessfully availing himself of Texas's appellate and post-conviction remedies, Prystash now seeks federal habeas relief from his conviction and sentence pursuant to 28 U.S.C. § 2254 [Doc. #52].

Respondent William Stephens has moved for summary judgment [Doc. # 57].  The Court has thoroughly examined the record in this case, including the state court pretrial, trial, appellate, and habeas proceedings.  Based on this review and the application of governing legal authorities – giving due consideration to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") – the Court grants the pending summary judgment motion, denies federal habeas relief, and dismisses this case.  This Court will not certify any issue for appellate review.

## FACTUAL AND PROCEDURAL SUMMARY

Robert Alan Fratta ("Fratta"), a public safety officer for Missouri City, married the former Farah Baquer ("Farah") in 1983.  They had three children.  After nearly a decade of marriage, the couple separated and Farah filed for divorce in March 1992.  The divorce proceedings became contentious, and Fratta became angry at the prospect of Farah receiving

custody of their children or being awarded more child support.  A trial on the issue of child custody was set for November 28, 1994.

On the evening of November 9, 1994, Fratta took the children to church while Farah got her hair cut.  A man approached when Farah returned home and exited her car.  The man shot, hitting her one time in the head.  After she fell to the ground, the man shot her a second time.  Neighbors saw the man wait near the bushes until a silver Nissan picked him up on the street.

After police and emergency responders arrived, Farah was taken to a hospital.  She was pronounced dead in the emergency room.

### A.     The Police Investigation

The police immediately focused their attention on Fratta as a possible suspect in his estranged wife's murder.  Several individuals told the police that Fratta had been looking for someone to kill his wife.  Tr. Vol. 17 at 58-60, 68-69, 118-19, 163-65.[1]  Fratta had asked numerous people if they knew of a hit man so that "the police . . . would have so many leads they really wouldn't know where to start and they would possibly think he wouldn't be a suspect, that just because he simply mentioned it that somebody might have took [sic] him serious and took it on themselves to do it."  Tr. Vol. 17 at 116, 164-65.

The police, however, did not make an arrest for several months.  Early on, the police suspected Prystash's involvement in the crime.  On the night of Farah's murder, Fratta continually went to the church office to check his pager and make phone calls.  Individuals in the church's office saw him repeatedly use the church phone between 7:30 and 8:00 p.m.  The police subpoenaed the phone records and found that Fratta had called the telephone

---

[1]     The state court records consist of a transcript that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "Clerk's Record , p. __"; a Statement of Facts including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "Tr. Vol. __, at __"; and a transcript of the state habeas proceedings, cited as "S.H.R. at __."  The Court will refer to the papers from Prystash's successive state habeas record as "S.S.H.R. at ___."

number of Prystash's girlfriend, Mary Gipp.  Tr. Vol. 18 at 455.

Numerous police officers were involved in the investigation into Farah's murder and in the interrogation of suspects: notably, Sergeant Danny Ray Billingsley, Detective George Ronald "Ronnie" Roberts, Detective William Valerio, Detective Larry Davis, and Detective Jim Hoffman.  The police interacted with Gipp and Prystash from November 1994 through March 1995.  In March 1995, Detective Roberts interviewed Gipp.  When the police first interviewed Gipp, she lied and said that she knew nothing about the murder.  Tr. Vol. 17 at 212.  By the time they returned with a grand jury subpoena, Gipp had hired an attorney.  After receiving a promise of immunity, Gipp gave the police crucial information that she had received from Prystash regarding Farah's murder.  *Id*. at 213-14.  Prystash had told Gipp that Fratta had enlisted him to kill Farah, and that he in turn recruited their neighbor Howard Paul Guidry to be the shooter.  *Id*. at 177-82.

Guidry was already in police custody.  The police had arrested him on March 1, 1995, while he fled the scene of a bank robbery.  Tr. Vol. 18 at 432-39.  Police recovered three guns from Guidry's book bag, including a Charter Arms .38 revolver.  Tr. Vol. 18 at 448-49; State's Exhibit 60.  On March 8, 1995, Guidry provided a written statement in which he claimed only reluctant participation in the murder as the getaway driver.  Guidry later revised his written statement and admitted to being the gunman.  He also walked through the crime scene with the police.  Importantly, Guidry described the murder-for-hire scheme and how the men carried it out.  Guidry's confession would serve as the impetus for the State of Texas to bring three capital prosecutions.  Constitutional infractions in the police's interrogation of Guidry ultimately resulted in two convictions being vacated, although each of these individuals were retried and again convicted.

On the same day that Guidry was charged with capital murder in Farah's death, the police obtained a pocket warrant for Prystash's arrest supported by an affidavit from Sergeant Danny Billingsley.  Tr. Vol. 18 at 463.  Two crucial sources of incriminating information lead to the arrest warrant: (1) "Mary Gipp's . . . details of the offense that were

communicated to Billingsley" and (2) "Guidry's statements against penal interest." S.S.H.R. at 539-40.   The police arrested Prystash on March 8, 1995.   During his subsequent interrogation with various police officers, Prystash denied knowing anything about the murder.   After about three hours, Prystash told officers "he would give [them] a statement about what he knew" if "he be allowed to leave, go home." Tr. Vol. 3 at 20-21.   An Assistant District Attorney informed the officers that giving a statement under that condition could be considered coercion.   Tr. Vol. 3 at 21.   The police released Prystash from custody.

Sergeant Billingsley later testified in a suppression hearing that "he drove [Prystash] . . . to pick up his car after his release from custody on March 8, 1995 . . . they stopped" and Prystash "said they needed to talk . . . ." S.S.H.R. at 540.   Prystash then confessed to Sergeant Billingsley that he "contacted Guidry about the murder; that Fratta supplied the gun and [Farah's] schedule; and, that [Prystash] drove Guidry to the offense and picked him up afterwards." S.S.H.R. at 540.   Sergeant Billingsley did not arrest Prystash again at that time. Before leaving, Prystash said that he would come to the police station to give a statement the next day.

When Prystash failed to show up at the station, the police obtained a new warrant on March 10, 1995.   S.S.H.R. at 541.   "[T]he underlying affidavit contained the information supplied by Sergeant Billingsley about the oral admissions against penal interest [Prystash] made to Billingsley after he was released from custody, as well as Guidry's statements against penal interest." S.S.H.R. at 541.   The "major difference in the affidavits in the first and second warrants was the inclusion in the second affidavit of the oral admissions [Prystash] made to Billingsley . . . ." S.H.R. at 187.   The affidavits, however, did "not refer to Guidry's confession as being voluntary; instead, the affidavits state that Guidry gave a statement against penal interest after being given his *Miranda* warnings." S.S.H.R. at 549-50.

On March 13, 1995, Prystash was arrested and gave a written statement, State's Exhibit 73, in which he confessed his involvement in Farah's murder. Tr. Vol. 18 at 614,

4

632; Tr. Vol. 19 at 714-29.  To summarize, Prystash's statement provided the police a detailed view into the murder-for-hire that ended in Farah's death.  Prystash had known "Fratta for about six or seven years from the gym."  Prystash explained that "[a]bout a month before Farah Fratta was killed," Fratta asked "do you know anybody that would kill my wife for me."  A short time later, Prystash met his neighbor Howard Guidry.  "[Guidry] told [Prystash] that he needed to make some money and he didn't care what he did."  Prystash asked him if he would kill Farah Fratta.  Guidry "told [Prystash] that he was willing. [Prystash] told him that [Fratta] was willing to pay $1,000 and more money later.  [Guidry] was interested right from the beginning because he wanted to go buy some cocaine and sell it."

The men "talked about several scenario[s]" for the murder.  "About a week before the killing, [Fratta] and [Prystash] met and he told [Prystash] that he was going to be at church the following Wednesday night.  [Fratta] said that the following Wednesday night would be . . . perfect because he would have his kids until 9:00 p.m."  Fratta later "gave [Prystash] a gun to give to [Guidry].  The gun was a . . . blue Police Bull Dog Special revolver which was probably a four inch barrel."

Prystash described the murder itself as follows:

> I took [Guidry] over to the parking lot of the Food City at 1960 East at Timber Forest.  We got there about 7:30 p.m.  At about 7:35, I got a page from [Fratta].  I called him back with either the store's pay phones or the mobile phone.  [Fratta] told me he was at church.  I told him that [Guidry] was ready to go.  [Fratta] said all right.  After I got off the phone with [Fratta], I drove [Guidry] to Farah's house.  I dropped him off at a phone, I dropped him off a few houses away from Farah's house.  I knew where to go because of the map [Fratta] gave me.  I believe I dropped him off shortly before 8:00 p.m.

> After I left [Guidry], I went back to the Food City and waited by the pay phones.  [Guidry] called me about 7:55 p.m.  He told me that she wasn't home yet.  I paged [Fratta] and he called me back.  [Fratta] told me, Wait, she'll be there.  I told him okay and hung up the phone.  Maybe five seconds later I got another call on the mobile phone.  [Guidry] told me come and get me fast.  He was kind of out of breath.  I hung up the phone and drove to

5

Farah's house.  [Guidry] was on the side of the garage.  He came out and got into the front passenger's side door.  I saw that the garage door was opened and that the light was off.  I couldn't see inside of the garage.  I could see a white car backed into the garage.  The car might have had a red emblem on the front. . . .  [Guidry] told me that he came up to her by her car on the driver's side of her car and . . . she stepped away from him.  He said that she told him, Please, don't kill me.  He said that he shot her in the head and she fell down.  He said that she was making noise, so he shot her again in the head.  He didn't tell me where in the head he shot her.

After we left Farah's house, I drove out of the subdivision and back west on FM 1960 toward my apartment.  Shortly after, before or after I got back to my apartment, I got a call from [Fratta].  I told him that his wife had been killed.  He told me that he would meet me at the gym at 9:00 p.m.  After [Guidry] and I got out of the car, I took the gun from the car.  [Guidry] had left it in the car.  I picked up the gun and took it into my apartment.  I took it into my bedroom and took all of the shells out of it.  I put the shells in the kitchen garbage.  After that I took the gun over to [Guidry]'s apartment and gave him the gun.  I told him that he should get rid of it.  [Guidry] told me that he was going to throw it in a lake or something.

After that I went to the President and First Lady in Humble.  [Fratta] never showed up.  The next night I saw the news and saw why [Fratta] did not show up.  I saw that he was going somewhere with the police.  The next evening after [Fratta] got out of jail [Fratta] called me. He told me that the police had confiscated the money he was going to pay [Guidry] with.  After I talked with [Fratta] I had to tell [Guidry] that he wasn't going to get his money for awhile.

As time went on [Guidry] got real mad about not getting paid.  I told him I would tell him where [Fratta] lived and where he worked out but he never asked for the information.  I tried to help [Guidry] get his money a few times.  [Fratta] kept putting me off.  I wanted to get [Guidry] off my back.  [Guidry] and I never got any money from [Fratta].

I've been depressed ever since this happened.  I didn't sleep a lot of nights because I felt bad about it.  [Fratta] called me several times after it happened to find out if my girlfriend, Mary Gipp, knew anything[.] . . . I was afraid that [Fratta] might hurt Mary by getting her involved.  I didn't want Mary to have anything to do with the whole situation.

Tr. Vol. 19 at 733-41.

On May 17, 1996, the State of Texas indicted Prystash.[2]  The indictment charged Prystash with "unlawfully, for remuneration and the promise of remuneration from ROBERT ALAN FRATTA, to wit: money, intentionally and knowingly caus[ing] the death of Farah Fratta . . . by shooting [her] with a deadly weapon, namely, a FIREARM."  Clerk's Record at 21.

The parties extensively litigated issues relating to Prystash's confession in state court. Prystash filed a pre-trial motion to suppress his confession claiming that the police neglected to inform him of his rights, refused to honor his invocation of the rights to silence and legal assistance, and coerced his confession.  On June 4, 1996, the trial court held a suppression hearing to consider Prystash's objections to his written and oral confessions.  The police officers involved in securing his statements testified that they read Prystash his rights, did not coerce his confession, and honored the invocation of his right to counsel until he initiated the discussion that resulted in his written statement.  Prystash did not testify in the suppression hearing.

The trial court orally denied Prystash's challenge to both the oral and written statements.  Tr. Vol. 3 at 224-26.  The trial court later issued explicit findings of fact and conclusions of law relating to the voluntariness of Prystash's confession and his oral statements to Sergeant Billingsley.  Clerk's Record at 382-91.  The trial court expressly found that police officers sufficiently informed Prystash of his rights, that Prystash voluntarily gave up those rights, that Prystash initiated the conversations leading to his oral statement, and that "each of the statements were voluntarily made, not induced by force, threats or coercion, nor were any promises made nor was anything done to induce the defendant or cause the defendant to make anything but a knowing and intelligent waiver of his rights and a free and voluntary decision to confess."  Clerk's Record at 390-91.

---

[2]     Gerald Bourque and Robert Morrow represented Fratta at trial.  This Court will generally refer to Fratta's trial attorneys collectively as "trial counsel."

### B.    The Trial of Prystash's Guilt

Trial began in July 1996.  Prystash's own words were the lynchpin of the prosecution's case against him.  The prosecution put Prystash's written statement before jurors, as well as his incriminating oral statements to Sergeant Billingsley.  Still, Prystash's confession was only one part of a detailed case proving Prystash's role in the murder-for-hire.

The prosecution relied heavily on Gipp's confirmation of the murder plot, both through her testimony about what Prystash told her and her observations of him during that time period.  Gipp's testimony verified much of Prystash's confession.  About six months before the murder, Fratta gave Prystash a gun.  Tr. Vol. 17 at 186.  A couple of months before the murder, Prystash told Gipp that Fratta "had asked him if he wanted to kill [Farah]." *Id*. at 177.  The two men met often, and Prystash told Gipp that they were planning "[t]o have Farah killed." *Id*. at 178.  They spoke every day in the week before Farah's murder. *Id*. at 174.

A few days before the killing, Prystash told Gipp that the murder was to happen on November 9 because Fratta "was going to church" with the children. *Id*. at 179.  Prystash said that their neighbor Guidry would be the shooter and that they would kill Farah at her house. *Id*. at 179, 185.  Prystash reported that "Guidry was going to get a thousand dollars, and [he, Prystash] was going to get a Jeep." *Id*. at 179-80.

After Gipp arrived at home on November 9, Prystash and Guidry left together, both dressed in black clothing.  Prystash took Gipp's telephone with him when he left. *Id*. at 193.  Prystash and Guidry returned two hours later. *Id*. at 196.  Prystash walked into the bedroom and unloaded the shells from a gun. *Id*. at 197.  When she asked, Prystash told Gipp that Farah had been killed. *Id*. at 201.

Prystash said that he dropped Guidry off at the Fratta home.  Guidry was waiting in the garage when Farah arrived. *Id*. at 217.  Prystash said that "Farah was shot twice; and that the first time in the head and when she flew back, then [Guidry] shot her again." *Id*. at 217.

8

Prystash then picked Guidry up in his "Silver Nissan." *Id*. at 218.[3]

A short while later, Prystash left to meet Fratta and pick up Guidry's money. *Id*. at 203. When Prystash had left, Gipp "took the bullets out of the garbage and put them in a . . . little sandwich baggie and then [she] went into the bedroom and [she] wrote down the information from the gun . . . and the serial number." *Id*. at 204.

Later that night, Gipp and Prystash saw a newscast describing how the police thought the murderer drove "a silver compact car and that the headlight was out." *Id*. at 209. Prystash "went and purchased a headlight, replaced it." *Id*. at 209. Later, Prystash took the car "and he had it crushed." *Id*. at 210.

Gipp hid the bullets. *Id*. at 206-07. She later threw them away. *Id*. at 208. Gipp told Prystash to get the gun out of their apartment. *Id*. at 208. Prystash "said he had given it to Guidry and that Guidry threw it in the water." *Id*. at 208.

Police testimony about Guidry's confession also came before the jury, but through the defense not the prosecution. During the cross-examination of a police officer, trial counsel introduced into evidence the pocket warrants for Prystash's arrest, which included the summary of Guidry's confession used to establish probable cause. Tr. Vol. 18 at 469-70. In the prosecution's later questioning, Sergeant Billingsley testified that Guidry was "cooperative" and gave "a written confession as to his involvement in the murder of Farah Fratta." *Id*. at 492. The prosecution asked him to read the information taken from Guidry's confession which provided a broad outline of the murder-for-hire. *Id*. at 506-09.

Aside from Prystash's police statement, Gipp's testimony, and the summary of Guidry's confession, other evidence also confirmed key elements of the plot to kill Farah.

---

[3]     Prystash argues in his petition that "[t]here is no evidence in the record that Prystash ever owned, drove, or otherwise had access to a gray two-door Nissan matching the description provided by witnesses to the murder" [Doc. # 52, pp. 13-14]. Gipp, however, testified at trial that Prystash drove a "silver four door Nissan" with a burned-out headlight. Tr. Vol. 17 at 190-91. Prystash "had [the car] crushed" after the murder. Tr. Vol. 17 at 210.

Phone records confirmed that Fratta had contacted Prystash around the time of the murder. A firearms examiner testified that the bullets recovered from Farah's body came from a weapon of the same manufacturer as the revolver the police recovered from Guidry. A check of federal firearms records showed that Robert Fratta had purchased that handgun in 1982. Farah's father described the gun as one owned by Fratta.

The defense rested in the guilt/innocence phase without calling any witnesses or presenting any evidence. Trial counsel renewed the attack on the voluntariness of Prystash's confession before the jury. Trial counsel obtained an instruction pursuant to Tex. Code Crim. Pro. art. 38.23, for the jury to disregard Prystash's confession if it believed or had a reasonable doubt that the police violated his constitutional rights in taking his statements. Tr. Vol. 20 at 809-11.

The jury deliberated for only seventeen minutes before finding Prystash guilty of capital murder.

### C.      The Sentencing Hearing

After a Texas jury has convicted a capital defendant, state law mandates determination of the sentence through answers to special issue questions. In this case, the trial court's instructions required the jury to decide (1) whether Prystash would be a future societal danger and (2) whether sufficient circumstances mitigated against the imposition of a death sentence. Clerk's Record at 441-42.

Both of the parties presented extensive evidence in the sentencing phase. The State's numerous witnesses described Prystash's lengthy and violent criminal record. In 1976, Prystash was charged with three counts of burglary and three counts of grand theft after the police recovered approximately twenty thousand dollars of stolen equipment and property from Prystash's home in Miami, Florida. Tr. Vol. 21 at 913-18. Prystash confessed to the crimes and also admitted to committing other burglaries. A short time later, the police arrested Prystash for a department store burglary. Prystash pleaded guilty to the crimes and received two years' probation. Tr. Vol. 21 at 953-60. Prystash subsequently requested that

his  probation be transferred to Ohio.  A warrant was issued for his arrest when he did not report his Ohio address or work location.

In 1984, Prystash received deferred adjudication for the offense of unauthorized use of a motor vehicle.  In 1988, he was adjudicated guilty for carrying a weapon.  In 1988, the police arrested Prystash for stealing a microwave from a hotel where he worked as a security guard.  *Id.* at 1071-77.  In 1991, he was arrested for attempted murder after beating his brother-in-law at a convenience store.

The prosecution also called Prystash's former wives to testify concerning his character.  One ex-wife testified that in their marriage Prystash was angry, had mood swings, showed little conscience, and never exhibited remorse.  *Id.* at 994.  After their divorce, Prystash only saw his daughter a couple of times.  *Id.* at 993.  Another ex-wife testified that Prystash was possessive, could not keep a job, was self-centered, has no conscience, and used other people.  *Id.* at 1022-24.

The prosecution's punishment case also emphasized the crime for which the jury convicted Prystash, including events surrounding the murder-for-hire that did not come before the jury in the guilt/innocence phase.  For instance, jurors heard that, some time prior to the murder,  Prystash entered Farah's house wearing a ski mask, went to her bedroom, and scared her while she was in bed with her children.

The defense called five witnesses in the punishment phase.  Trial counsel's strategy employed three themes: (1) question some of the evidence against Prystash; (2) present jurors with an understanding of his background; and (3) show his remorse, religiosity, and ability to be free from violence while incarcerated.

The defense first called a police officer who testified that it was possible that it had been Fratta, not Prystash, who had broken into Farah's home and scared her.  Tr. 22 at 1181-82.  Next, counsel called two family members who provided insight into Prystash's upbringing.  Joanne Hambrick, Prystash's aunt whom his family lived near in Ohio until he was about six years old, described Prystash's family.  Prystash's father was a workaholic.

11

His mother drank alcohol excessively and was impatient, abusive, and neglectful in her parenting. *Id.* at 1183-92. Prystash's mother died of cancer when he was eighteen. *Id.* at 1186-88. Another aunt, Irene Prystash, described how his mother was not a good parent. She described Prystash's mother as cruel, but she never saw his mother use physical violence. *Id.* at 1194-97.

The defense tried to show that incarceration would keep Prystash from being a future threat to society. The defense called Dr. Walter Quijano, a psychologist, who reviewed Prystash's jail records but never met with him. Dr. Quijano testified about the details of the TDCJ prison classification system. *Id.* at 1249-51. Dr. Quijano opined that the prison system had sufficient resources to control inmates' dangerousness. *Id.* at 1255.

A volunteer chaplain in Harris County Jail testified that Prystash attended church services in jail, seemed honest and sincere, and did not appear to be a threat. *Id.* at 1199-1203. Another volunteer who taught Bible study in the Harris County Jail testified that Prystash attended his group faithfully for over a year. He described Prystash as quiet, attentive, and interested in learning the Bible. *Id.* at 1212-18. He testified that Prystash seemed sincere, was not a danger to others, and had helped others improve their lives. *Id.* at 1221-24.

The jury answered Texas's special issue questions in a manner requiring the imposition of a death sentence.

### D.   Appellate and Post-Conviction Review

The Texas Court of Criminal Appeals ("TCCA") issued a published opinion on September 15, 1999, affirming Prystash's conviction and sentence. *Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999). Prystash filed an application for state habeas relief in 1998. Based on the lower court's findings and conclusions, TCCA denied Prystash's petition on April 28, 2004. *Ex parte Prystash*, No. 58,537-01.

In 2004, this Court appointed counsel to prepare and litigate a federal habeas petition on Prystash's behalf. Respondent filed an answer and moved for summary judgment on all

the claims raised by Prystash's petition. When Prystash first filed his petition, however, he had not exhausted some claims in a state court.[4] Because federal law generally limits habeas relief to claims advanced in state court, 28 U.S.C. § 2254(b)(1), the Court stayed this action to allow Prystash's return to state court [Doc. # 28].

Prystash sought leave in the TCCA to file a successive state habeas application. The TCCA only allowed successive proceedings on part of one claim. *Ex parte Prystash*, No. WR-58,537-02, 2008 WL 5245551, at *1 (Tex. Crim. App. Dec. 17, 2008).[5] The lower court eventually issued findings of fact and conclusions of law recommending the denial of habeas relief. The TCCA denied relief after adopting most of the lower court's findings and conclusions. *Ex parte Prystash*, No. WR-58,537-02, 2013 WL 1232893 (Tex. Crim. App. Mar. 27, 2013)

Prystash filed an amended federal petition raising the following grounds for relief:

1. The prosecution suppressed evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and presented false testimony under *Giglio v. United States*, 405 U.S. 150 (1972), with respect to the voluntariness of a co-defendant's testimony and the existence of an FBI complaint relating to Prystash's confession.

2. The prosecution improperly exerted peremptory challenges against members of a cognizable racial group in violation of *Batson v.*

---

[4] Specifically, Prystash had not given the state courts an opportunity to rule on his arguments that: (1) the prosecution suppressed evidence and presented false testimony with respect to the voluntariness of a co-defendant's testimony and the existence of a federal complaint relating to Prystash's confession; (2) the prosecution improperly exerted peremptory challenges against members of a cognizable racial group in violation of *Batson v. Kentucky*, 391 U.S. 510 (1968); (3) Prystash's trial, appellate, and state habeas attorneys provided constitutionally ineffective assistance; (4) the trial court improperly removed several prospective jurors for cause.

[5] The TCCA specifically found that only "part of . . . [Prystash's] claim that the State suppressed evidence with respect to the voluntariness of his co-defendant's confession satisfies the requirements of Texas Code of Criminal Procedure Article 11.071, Sec. 5(a)."

*Kentucky*, 391 U.S. 510 (1968).

3.     The trial court improperly limited the testimony of a defense witness in the punishment phase.

4.     The trial court violated the Constitution by admitting in evidence allegedly prejudicial and inflammatory crime scene photographs at trial.

5.     Prystash's trial, appellate, and state habeas attorneys provided constitutionally ineffective assistance.

6.     The State improperly removed several prospective jurors with peremptory strikes because of their views on capital punishment.

7.     The trial court improperly limited the presentation of evidence relating to the prosecution's plea offer.

8.     The trial court failed to submit the "anti-parties" special issue in the punishment phase.

9.     Texas's "12-10" Rule violates the United States Constitution.

10.    Texas violates the Constitution by not placing a burden of proof on the prosecution with regard to the mitigation special issue.

11.    The trial court unconstitutionally failed to limit the jury's consideration of unadjudicated prior offenses.

12.    The trial court improperly instructed the jury concerning the mitigation special issue.

[Doc. # 52].[6] Respondent William Stephens has moved for summary judgment [Doc. # 57]. Respondent argues that state procedural law bars federal consideration of the claims Prystash first raised in his federal petition, with the exception of the claim on which the state court authorized review.  Respondent otherwise argues that Prystash's claims fail to comply with AEDPA requirements for relief or are meritless.

---

[6]     The Court has numbered the claims in Prystash's federal petition consistent with the manner laid out in Respondent's motion for summary judgment.

14

## STANDARD OF REVIEW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence.  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens."  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  The States, therefore, "possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights."  *Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Federal habeas law does not merely acknowledge a State's inherent authority as a dual sovereign to adjudicate federal constitutional claims; federal law "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 15 (2013); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing AEDPA's "presumption that state courts know and follow the law").  Given this required deference to the state-court system, several principles circumscribe both the nature of federal habeas review and the availability of federal habeas relief.

As an initial matter, AEDPA "unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  Accordingly, "federal habeas corpus relief does not lie for errors of state law."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quotation omitted); *see also Corcoran*, 562 U.S. at 16; *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  "[O]nly noncompliance with federal law . . . renders a State's criminal judgment susceptible to collateral attack in the federal courts."  *Corcoran*, 562 U.S. at 5.

How an inmate has litigated his claims determines the course of federal habeas

adjudication.   Under the exhaustion doctrine, AEDPA precludes federal relief on constitutional challenges that an inmate has not first raised in state court.  *See* 28 U.S.C. § 2254(b)(1).  As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate claims in compliance with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).   A federal court may only review an inmate's unexhausted or procedurally barred claims if he shows: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'"   *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).[7]

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review.  "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'"  *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting *Titlow*, 134 S. Ct. at 16).  Under AEDPA's rigorous showing, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2).

Inmates arguing legal error in state court decisions must comply with § 2254(d)(1)'s

---

[7]     Respondent contends that a procedural bar forecloses federal consideration of claims two, five, six, and nine.  As the Court will discuss later, procedural defects also hamper federal review of other claims raised by Prystash.

"contrary to" and "unreasonable application" clauses. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). A petitioner does not merit relief by merely showing legal error in the state court's decision. *See White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). In contrast to "ordinary error correction through appeal," AEDPA review exist only to "guard against extreme malfunctions in the state criminal justice systems . . . ." *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376 (2015) (quotation omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

An inmate's compliance with 28 U.S.C. § 2254(d) does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (observing that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28

17

U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively").  A habeas petitioner meeting his AEDPA burden must still comply with weighty jurisprudential tenets, such as the harmless error doctrine and the non-retroactivity principle, that bridle federal habeas relief.  *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005).  Thus, any error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict,'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)), or would not require the creation of new constitutional law, *see Banks*, 536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

With those standards in mind, the Court turns to the issues presented in Prystash's federal petition.

## ANALYSIS

## I.  SUPPRESSED EVIDENCE AND FALSE EVIDENCE/TESTIMONY (CLAIM ONE)

In the two decades that have passed since Prystash's conviction, federal courts have vacated his co-conspirators' convictions because the police violated Guidry's rights when taking his statement.  Prystash argues that the same constitutional flaws in Guidry's confession require relief from his own conviction.  Prystash's first federal habeas claim contains three subcomponents: (1) the prosecution suppressed evidence relating to Guidry's confession in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the use of Guidry's confession at Prystash's trial, and the references to it by the State and its witnesses, amounted to false evidence and testimony under *Giglio v. United States*, 405 U.S. 150 (1972)[8] ; and (3)

---

[8]  Prystash generally refers to these arguments as *Brady/Giglio* violations, *see, e.g.,* Doc. # 52, p. 36, and does not distinguish between the suppression and false evidence or testimony components.  The Supreme Court has not clarified the distinction between a *Brady* and *Giglio* claim.  *See Weary v. Cain*, ___ U.S. ___, ___ S. Ct. ___, 2016 WL 854158, at *3 (Mar. 7, 2016); *Banks v. Dretke*, 540 U.S. 668, 690 n.11 (2004).  The Fifth Circuit sometimes uses the two case names together, but also often refers to suppression issues as *Brady* claims and issues alleging presentation of false

(continued...)

the prosecution violated both *Brady* and *Giglio* in relation to a complaint Prystash had filed with the FBI.

### A.    Procedural Posture of *Brady*/*Giglio* Claims and Appropriate Scope of Federal Review

Before turning to the substance of Prystash's first ground for relief, the Court must make clear the procedural status of each subclaim and the relevant law that applies.  Prystash did not raise this, or any related claim, until he filed a federal petition.  He then sought leave to file a successive habeas application on that claim, among others.  Respondent states that during those proceedings "[o]nly the first claim, which Prystash terms the 'voluntary confession claim' was litigated by the state courts" [Doc. # 57, p. 26 n.2].  The TCCA's order authorizing successive proceedings only allowed Prystash to proceed on "part of allegation one."  *Ex parte Prystash*, No. WR-58,537-02, 2008 WL 5245551, at *1 (Tex. Crim. App. Dec. 17, 2008).  The parties' federal briefing has not discussed which "part of allegation one" proceeded to litigation.  The TCCA narrowly limited the claims that Prystash could  litigate.  He was permitted to address only "the claim that the State suppressed evidence with respect to the voluntariness of his co-defendant's confession."  *Id*.  That litigation allowed by the TCCA determines the course and nature of federal habeas review, including which issues require AEDPA deference and which may be procedurally barred.

The parties agree that the TCCA authorized review on the *Brady* argument relating to Guidry's police statement.  The Court will apply AEDPA deference to the relevant findings of fact and conclusions of law entered by the lower court and subsequently adopted by the TCCA.

---

[8]        (...continued)
evidence/testimony as *Giglio* claims.  *See Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004) (treating the two categories as separate claims).  The Fifth Circuit also refers to claims that the Government suppressed impeachment evidence as *Giglio* claims.  *See United States v. Lopez-Perez*, 514 F. App'x 463, 464 (5th Cir. 2013).  This Court will generally refer to Prystash's false evidence/testimony argument as a *Giglio* claim to be consistent with the language in the successive state court proceedings.

The parties' briefing assumes that the TCCA authorized review of the *Giglio* issue relating to Guidry's confession.   The TCCA's order only allowed Prystash to file a successive state habeas application relating to his "claim that the State suppressed evidence," not the separate and distinct allegation that it presented false testimony under *Giglio*. Prystash, nonetheless, briefed the *Giglio* arguments in his successive state habeas application. S.S.H.R. at 24, 317.   The State in turn responded to those arguments, including in its proposed findings of fact and conclusions of law.   S.S.H.R. at 185-89.   The lower habeas court made factual findings and entered conclusions of law relating to the *Giglio* issue. S.S.H.R. at 543, 550-53.

The TCCA, however, refused to adopt most of the factual findings and any of the legal conclusions relating to the *Giglio* issue, possibly signaling that it had not authorized review of that portion of the claim.   *Ex parte Prystash*, No. WR-58,537-02, 2013 WL 1232893 (Tex. Crim. App. Mar. 27, 2013).   Notwithstanding, the TCCA did not excise all references to *Giglio* from the lower court's opinion.   The TCCA's order adopted finding of fact number 117:

> The Court finds that [Prystash] does not meet the [requirements] of *Giglio*; he does not show that the State presented false testimony at [Prystash's] trial that was material in that there was a reasonable likelihood that it affected the jury's judgment in finding [Prystash] guilty.

S.H.H.R. at 551.[9]

---

[9]   In some findings and conclusions that the TCCA did not adopt, the lower court found that Prystash had "not show[n] that the State used testimony knowing it was false . . . ." S.S.H.R. at 551.   In 2009, the TCCA held that the State's *unknowing* use of false testimony violates due process.   *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009); *see also Ex parte De La Cruz*, 466 S.W.3d 855, 865 (Tex. Crim. App. 2015).   The Supreme Court, however, has never held that a *Giglio* violation occurs from the unknowing use of false testimony.   *See Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir. 2011) (recognizing that the Supreme Court has never clearly established whether a due process violation occurs "when perjured testimony is provided by a government witness even without the government's knowledge"); *see also Cash v. Maxwell*, ___ U.S. ___, 132 S. Ct. 611, 615 (2012) (Scalia, J., dissenting to refusal (continued...)

Given the state court's inconsistent treatment of the *Giglio* claim, some question exists whether a procedural bar forecloses federal review of its merits.  Respondent, however, has neither invoked the procedural bar nor waived its application to the *Giglio* claim.  For the sake of judicial economy, the Court will analyze the merits of the *Giglio* claim under *de novo* review.  *See Roberts v. Thaler*, 681 F.3d 597, 605 (5th Cir. 2012) ("While our normal procedure is to consider issues of procedural default first, we may nonetheless opt to examine the merits first . . . .").  In doing so, the Court will not apply AEDPA deference to the findings and conclusions of the state trial court specifically rejected by the TCCA on successive habeas review.  AEDPA deference does apply, however, to finding 117 that the appellate court left intact, as well as to any findings relating to the *Brady* claim that share a common factual relationship.

Notably, however, for the issues adjudicated in state court, Prystash must show that the state adjudication was contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  The relevant federal law is well-established.  Under *Brady*, the State may not suppress evidence favorable to the accused when that evidence is material either to guilt or punishment.  373 U.S. at 87.  In *Giglio*, the Supreme Court "made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

Further, the TCCA did not authorize successive habeas review of the *Brady*/*Giglio* argument relating to the existence of the FBI complaint.  *Ex parte Prystash*, No.

---

[9]      (...continued)
to grant certiorari) ("[T]he Ninth Circuit also stretched the Constitution, holding that the use of [ ] false testimony violated the Fourteenth Amendment's Due Process Clause, whether or not the prosecution knew of its falsity.  We have never held that, and are unlikely ever to do so.  All we have held is that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.").  The parties have not discussed how the differences between federal and state law influenced the issues adjudicated by the Court of Criminal Appeals.

WR-58,537-02, 2008 WL 5245551, at *1 (Tex. Crim. App. Dec. 17, 2008).  Prystash, nonetheless, extensively discussed the FBI complaint in his successive state habeas application and in his proposed findings and conclusions.  S.S.H.R. at 337.  The State, however, did not respond to that argument and the state court's findings and conclusions did not adjudicate its merits.  The TCCA's order refusing to authorize successive proceedings on the FBI issue should procedurally bar federal review.

Respondent, however, does not argue that a state procedural bar precludes review of the FBI-complaint sub-claim.  This Court accordingly will consider the merits of Prystash's argument that the prosecution withheld information about, and presented false testimony relating to, his FBI complaint.  No state adjudication on the merits exists and thus AEDPA deference cannot be applied to this sub-claim.  Even under a *de novo* review, the argument lacks merit.

### B.    Factual Background Regarding Guidry's Confession and Its Impact on Prystash's Case

A more-ample discussion of the circumstances surrounding Guidry's confession and its impact in each co-conspirators' trial frames judicial review of Prystash's first ground for relief.  Strong circumstantial evidence implicated Fratta, Prystash, and Guidry in Farah's murder.  The three prosecutions for Farah's murder relied on common themes.  From the beginning of Guidry's case, however, questions arose about the voluntariness of his confession. Guidry's confession played some part in all three trials.  During federal habeas review of Guidry's confession, it was shown that the State of Texas secured Guidry's confession by violating his constitutional rights.  One judge succinctly described the police deception resulting in Guidry's confession:

> On 1 March 1995, Guidry was arrested for bank robbery; in his possession was the gun used to murder Farah Fratta on 9 November 1994.  On 7 March 1995, while Guidry was being held on the bank-robbery charge, Detectives Roberts and Hoffman questioned him about Farah Fratta's murder, resulting in his confession.  The testimony at the pre-trial hearing on Guidry's motion to suppress the confession provided sharply contrasting versions of the interrogation leading to the confession.  Guidry claimed: his robbery-charge

> attorney had instructed him not to discuss anything with anyone; therefore, when interrogated about Farah Fratta's murder, Guidry requested his attorney; after his second request, Detectives Roberts and Hoffman left the room; on returning, they advised Guidry they had contacted his attorney, who had given Guidry permission to answer their questions; and, in reliance on such alleged permission, Guidry confessed.

*Guidry v. Dretke*, 429 F.3d 154, 155 (5th Cir. 2005) (Barksdale, J., comments regarding denial of reh'g *en banc*).  After an evidentiary hearing, the Honorable Vanessa Gilmore confirmed that the police secured Guidry's confession through deceit in violation of the Fifth Amendment.  While nothing undermined the correctness of Guidry's account of the crime, the Constitution could not tolerate the circumstances that induced the confession.

The Fifth Circuit noted that, in Fratta's trial, other than Guidry's confession, "[t]he admissible evidence . . . suggested that Fratta, Prystash, and Guidry were, to varying degrees, somehow involved in Farah's death," *Fratta v. Quarterman*, 536 F.3d 485, 508 (5th Cir. 2008), but did not prove murder for remuneration.  The Fifth Circuit summarized the admissible evidence common to the trials as follows:

> Farah's neighbors testified that they saw a black man near Farah's garage shortly after the shooting (Guidry is black), and that this man was picked up by a car with a burned-out headlight that matched the description of Prystash's car.  Gipp testified that: Fratta and Prystash's relationship grew closer in the time leading up to the murder; on the day of the murder Guidry was dressed in black and waiting for Prystash on the steps leading to her apartment; Prystash came home and left shortly thereafter; Prystash returned with Guidry around 8:30 that night; and Prystash entered Gipp's room and unloaded two shells from a revolver.  The serial number recorded from this revolver by Gipp matched the serial number of the gun recovered from Guidry after the bank robbery. Federal records established that Fratta had purchased the revolver, and a firearms examiner determined that it had fired at least one of the bullets recovered  from the scene of the crime.  Phone records tended to show that Fratta and Prystash were in contact on the day of the murder, and numerous witnesses described how Fratta talked openly about killing or having someone kill Farah and asked several people if they or anybody they knew would kill Farah.  Law enforcement officials also found $1,050 in cash in Fratta's car on the night of the murder.

*Id*. at 508-09.  However strong the evidence showing the three men's complicity in the

murder, the State had to prove more than their mere involvement in a killing.  "[T]he State's burden was to produce affirmative proof that a murder-for-hire had occurred . . . ."  *Id.* at 509.  Absent Guidry's confession, little evidence in Guidry and Fratta's cases supported the specific charge in the indictment, that the men committed a murder-for-hire.   More particularly, in Fratta and Guidry's cases, the only other information showing remuneration was hearsay testimony about Prystash's statements to others.   On federal review of both Fratta and Guidry's trials,

> [t]he evidence offered by the State in support of these allegations, however, consisted entirely of hearsay statements attributed to Prystash and Guidry and introduced to the jury through Sgt. Billingsley and Gipp. Although $1,050 was found in Fratta's car on the night of the murder, there was no admissible evidence tying this money to Guidry. Nor was there evidence showing that Fratta's Jeep had been promised to Prystash. Rather, it was the custodial confessions and Prystash's statements to Gipp that the State relied on to meet its "heavy burden" of showing that Farah's murder was performed for pecuniary gain.

*Id.*  In both Fratta and Guidry's federal habeas action, the federal courts found that testimony about Prystash's statements was inadmissible hearsay admitted in violation of the Confrontation Clause.

Eventually, federal courts granted habeas petitions for both Guidry and Fratta because, absent Guidry's illegal confession operating in conjunction with impermissible hearsay testimony, the evidence suggested their involvement in the murder, but did not show that the men conspired to commit the murder for remuneration.  The State of Texas has since retried both men without the taint of the inadmissible evidence.  Juries again have convicted both men of capital murder.  Both men are on death row.[10]  Currently, both men are seeking federal habeas corpus relief from their capital convictions and death sentences.

### 1.     Differences Among the Co-Conspirators' Trials

Prystash argues that "[f]oremost, the prosecution used Guidry's fraudulently-obtained

---

[10]     Prystash is mistaken that "Guidry's conviction was, of course, vacated; and the State has not taken any steps to retry Guidry" [Doc. # 52, p. 2].

confession by prompting Sergeant Billingsley to read to the jury Detective Robert's false affidavit, which simply recited the substance of Guidry's illegally obtained confession and perjuriously stating the confession was voluntarily given" [Doc. # 52, p. 35]. Prystash contends that "[t]he jury thus heard unimpeached – yet certainly impeachable – evidence and testimony that Guidry had, supposedly, freely and voluntarily confessed, after *Miranda* warnings were properly given, to his own, as well as Prystash's, involvement in the crime" [Doc. # 52, p. 35]. Prystash's claim is essentially that the prosecution violated the Constitution by presenting the jury with the substance of Guidry's involuntary confession without disclosing the wrongful circumstances of how it was obtained.

Prystash's case comes before this Court in a posture different from that the federal courts faced in his co-conspirators' challenges. In those cases, Guidry's confession was the primary source of information regarding the remuneration element of capital murder.[11] In both the co-conspirators' cases, the prosecution bolstered Guidry's confession to murder-for-remuneration with hearsay statements. In Fratta's case, the State relied on oral hearsay statements Prystash made to Sergeant Billingsley and Mary Gipp's recitation of hearsay statements made by Prystash. In Guidry's case, the prosecution relied on Gipp's hearsay testimony. But, Prystash's jury heard Prystash's own confession to involvement in the murder-for-hire scheme. The entirety of Prystash's lengthy written statement to the police came before jurors. Tr. Vol. 19 at 731-42. Sergeant Billingsly also testified about the oral statements Prystash made to him after Prystash's March 8 arrest. Tr. Vol. 18 at 525-27, 535-36. Prystash's own words overwhelmingly provide a basis for the jury to find him guilty of capital murder for remuneration beyond a reasonable doubt.

While Prystash has repeatedly cast aspersions on the police officers' efforts to secure statements from him, Prystash understandably now does not raise a constitutional challenge to his own confession. The state trial court examined the voluntariness of Prystash's written

---

[11]   In Guidry's case, the prosecution presented his full confession. In Fratta's trial, Sergeant Billingsley related portions of Guidry's confession, without the full statement coming into evidence.

statement in a motion to suppress and allowed it to come before the jury.  Prystash did not ask the state appellate or habeas courts to reconsider the evidence concerning the voluntariness of his confession.  On successive habeas review, the state court emphasized that his "written confession was given after he knowingly, intelligently, and freely waived his *Miranda* rights: rights that were repeatedly given to him."  S.S.H.R. at 544.

## 2. Use of Guidry's Confession in Prystash's Case

Given the fundamental differences among the three cases, Prystash brings a unique constitutional challenge based on the illegality of how Guidry's confession was obtained. Prystash's federal habeas action relies on the legal defects in Guidry's confession to argue that the prosecution suppressed evidence and presented false evidence or testimony.

This creative argument is unsupported by the record.  At trial, highly incriminating evidence showed Prystash's involvement in the murder.  The defense knew that the State would put Prystash's confession before the jury, along with independent evidence and testimony corroborating that account from Gipp and other witnesses.  Guidry's confession only became part of the case against Prystash, however, when trial counsel introduced it into evidence.  Prystash's confession put trial counsel in "a very difficult situation that called for certain trial tactics . . . in an effort to save a man from himself and in spite of him."  S.H.R. at 202.  Circumstances drove the defense to adopt two strategies: (1) convince the jury to disregard Prystash's statement by arguing that unconstitutional police action forced him to confess and (2) minimize Prystash's role in the case by emphasizing that Guidry was the actual shooter.  S.H.R. at 202.  With those goals, during Detective Robert's cross-examination, trial counsel, not the State, introduced into evidence State's Exhibits 96 and 97, Prystash's two arrest warrants, including the affidavits.  Tr. Vol. 18 at 469-70; *see* S.S.H.R. at 548-49.[12]  On habeas review, trial counsel explained that, for strategic reasons, namely,

---

[12]     During the first round of state habeas review, the courts concluded that "[t]rial counsel are not ineffective for pursuing the reasonable trial strategy of attempting to impeach the police officers' testimony concerning the arrest of [Prystash] by (continued...)

to undermine the officers' credibility regarding the voluntariness of Prystash's confessions, counsel introduced the affidavits into evidence. Still, "Roberts did not testify about the contents of the underlying affidavits." S.S.H.R. at 549.

Later in trial, during Sergeant Billingsley's testimony, the State also introduced the warrants and associated affidavits (labeling them State's Exhibits 96A and 97A). Tr. Vol. 18 at 534. During the prosecution's direct examination, Sergeant Billingsley read to the jury the basis for securing that warrant, including the information taken from Guidry's confession. Tr. Vol. 18 at 506-09; *see* S.S.H.R. at 549 ("[T]he State ha[d] Sergeant Billingsley read aloud the contents of the affidavit for [Prystash's] March 8, 1995 arrest, an affidavit that contained Guidry's statements against penal interest."); *cf.* S.S.H.R. at 543.

Trial counsel attacked the validity of the arrest warrants in closing arguments as one dimension of the improper police conduct during his questioning and arrest. Tr. Vol. 20 at 833-36. The prosecution, in turn, bolstered their case through the use of Guidry's statements in the arrest warrant:

> And they go and see Guidry. And he's cooperative. And he's remorseful frankly. *And he tells them the truth*. And you know that from that trick warrant. You know exactly what Guidry says happened because it's in that warrant. Guidry links them to the gun. The gun matches the serial number that Mary Gipp gave to the police the day she was in the presence of her lawyer and handed it to the policeman.

Tr. Vol. 20 at 856 (emphasis added). The prosecutor argued that, in getting a warrant for Prystash's arrest, "[t]here is no deception of anybody involved." Tr. Vol. 20 at 861.

Having reviewed the use of Guidry's confession in the trials of Prystash and his co-conspirators, the Court turns to Prystash's claim that the State violated his constitutional

---

[12]       (...continued)
introducing State's Exhibits 96 and 97, pocket warrants for [his] arrest, attacking the circumstances of [his] arrest warrants, arrest, questioning, and confession." S.H.R. at 195. Additionally, the "information contained in the warrant affidavits . . . was also properly admitted and corroborated in other portion[s] of [Prystash's] trial, including [his] own statements." S.H.R. at 195.

rights by suppressing evidence or presenting false evidence/testimony.

### C.    *Brady* Claim Relating to Guidry's Confession in Prystash's Trial

Prystash claims that the prosecution suppressed information about police misconduct in obtaining Guidry's confession.   "To make a *Brady* claim, [a petitioner] must prove: (1) that the 'evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;' (2) that the 'evidence [has] been suppressed by the State, either willfully or inadvertently;' and (3) that 'prejudice [has] ensued.'" *Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

The state habeas court provided three persuasive reasons to deny habeas relief on Prystash's *Brady* argument.  First, Prystash "fail[ed] to show that information about any flaws in the taking of Guidry's confession – the federal district court's future legal holding – was material, *i.e.*, that it would have created a reasonable probability that the results of the proceeding in [Prystash's] trial would have been different, in light of the overwhelming evidence of [his] guilt."  S.S.H.R. at 552.  Second, Prystash "fail[ed] to show that any flaw in the taking of Guidry's confession impacted the voluntariness of [Prystash's] non-custodial, oral admissions and his written statement."  S.S.H.R. at 552-53.  Finally, Prystash did not show "harm based on the sparse testimony about Guidry's confession and testimony concerning the information supplied by Guidry being cumulatively supplied by other witnesses, including [Prystash] via his own confession."  S.S.H.R. at 553.[13]

---

[13]    The TCCA did not adopt another reason the lower habeas court gave to deny relief:

> The applicant fails to show that the State suppressed a future legal finding and holding, i.e., the federal district court's de novo finding that Guidry was credible in his assertion that he asked for an attorney and that detectives told him that his attorney for the unrelated robbery case said he could talk to them - with the resulting finding that his confession was involuntary, in light of Guidry's confession being found voluntary prior to the applicant's trial and in light of the State's
>
> (continued...)

28

The state court's findings emphasized that information about Guidry's confession would not have made any difference in Prystash's trial.  Under *Brady*, "[e]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).  "[T]he materiality test is not a test of the sufficiency of the evidence. . . .  Rather, a *Brady* violation is established by showing 'that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *Graves*, 442 F.3d at 340 (quoting *Kyles*, 514 U.S. at 435); *see also United States v. Bagley*, 473 U.S. 667, 682 (1985); *Duncan v. Cain*, 278 F.3d 537, 539-40 (5th Cir. 2002).

Prystash's case comes before this Court in a distinct posture from those the federal courts faced in the challenges from his co-conspirators.  The State ensured that Guidry's confession played a major role in Guidry and Fratta's trials.  In Guidry's case, the prosecution presented his full confession.  In Fratta's trial, Sergeant Billingsley related portions of Guidry's confession, without the full written statement coming into evidence.  In both cases, only hearsay otherwise showed that Farah's killing was a murder-for-hire.

In contrast to the prosecutions of Prystash's co-conspirators, this Court must presume the state court finding correct that "Guidry's confession did not play a vital role in implicating" Prystash.  S.S.H.R. at 550.  The State did not rely on Guidry's confession as the primary factor proving remuneration.  As previously discussed, Gipp provided detailed testimony about Prystash's involvement in the conspiracy, and particularly describing how Prystash reported that "Guidry was going to get a thousand dollars, and [he] was going to get a Jeep." *Id*. at 179-80.  The state court found that Prystash's "actions in front of Mary Gipp,

---

13          (...continued)

> inability to predict a credibility finding made six years after the
> applicant's trial after a *de novo* evidentiary hearing.

S.S.H.R. at 551.  Despite Respondent's invitation to adopt this reasoning, Doc. # 57, pp. 43-44, the Court does not base its decision on the repudiated factual finding.

his statements to Mary Gipp, Mary Gipp's admissions to the police, phone records, other inculpatory evidence, and [Prystash's] voluntary confessions played the 'vital role'" in his conviction.  S.S.H.R. at 550.

Although federal courts found that Gipp's hearsay recitation of Prystash's comments about remuneration violated the Confrontation Clause as to Guidry and Fratta, Prystash's case placed her testimony in a different light.  Any error in the admission into evidence of hearsay testimony in his co-conspirators' cases because of the Confrontation Clause, *i.e.*, concerns about Gipp's and Sergeant Billingsley's recitation of Prystash's comments, evaporate when used against Prystash himself.[14]

Crucially, Prystash's jury also heard Prystash's own confession to his involvement in the murder-for-hire scheme.  The entirety of Prystash's lengthy March 13 written statement to the police came before jurors.  Tr. Vol. 19 at 731-42.  Sergeant Billingsley also testified about the oral statements Prystash made after his March 8 arrest.  Tr. Vol. 18 at 525-27, 535-36.  The state courts observed in Prystash's case that "the same information found in Guidry's statements" was "cumulatively presented through . . . [Prystash's] own statements." S.H.H.R. at 550.  Prystash's own words overwhelmingly provided a basis for the jury to find him guilty of capital murder for remuneration beyond a reasonable doubt.

While Prysatsh's petition repeatedly faults the police officers' method of securing statements from him, Prystash did not ask the state appellate or habeas courts to reconsider the evidence concerning the voluntariness of his confession.  Prystash understandably does

---

[14]     The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."   "[N]o clear authority exists for the proposition that the Sixth Amendment guarantees a right to 'confront oneself at trial." *Torres v. Roberts*, 253 F. App'x 783, 787 (10th Cir. 2007); *see also Crawford*, 541 U.S. at 51 (stating that the Confrontation Clause applies to "witnesses against the accused"); 4 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 802.05(3)(d) at 802–25 (2d ed. 2005) (explaining "a party cannot seriously claim that his or her own statement should be excluded because it was not made under oath or subject to cross-examination").

not now raise a constitutional challenge to his own confession. The trial court examined the voluntariness of Prystash's confession in a motion to suppress, denied the motion, and allowed the confession to come before the jury. On successive habeas review, the state court found that his "written confession was given after he knowingly, intelligently, and freely waived his *Miranda* rights: rights that were repeatedly given to him." S.S.H.R. at 544. Prystash has not convincingly shown any relationship between the error regarding Guidry's confession and the voluntariness of his own confession.

Given the highly incriminating evidence admitted in Prystash's case distinct from the co-conspirator's confession evidence, the Court concludes that the state court's denial of his *Brady* claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### D.    False Evidence/Testimony Claim Relating to Guidry's Confession

Prystash also claims that the blemishes from Guidry's confession resulted in the prosecution's presentation of false evidence and testimony. Prystash argues that "[f]oremost, the prosecution used Guidry's fraudulently-obtained confession by prompting Sergeant Billingsley to read to the jury Detective Robert's false affidavit, which simply recited the substance of Guidry's illegally obtained confession and perjuriously stating the confession was voluntarily given" [Doc. # 52, p. 35]. Prystash contends that "[t]he jury thus heard unimpeached – yet certainly impeachable – evidence and testimony that Guidry had, supposedly, freely and voluntarily confessed, after *Miranda* warnings were properly given, to his own, as well as Prystash's, involvement in the crime." *Id*. Prystash's claim here is essentially that the prosecution violated the Constitution by presenting the jury with the substance of, and false testimony about acquisition of, Guidry's involuntary confession.

While the State may "prosecute with earnestness and vigor" it still must "refrain from improper methods calculated to produce a wrongful conviction . . . ." *United States v. Young*, 470 U.S. 1, 7 (1985) (quotation omitted). "It is well settled that the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected." *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998). "To establish a due process violation based

on the government's use of false or misleading testimony, a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997).

Respondent argues that "Prystash's assertions of false testimony are incorrect" because Guidry's confession "was eventually found to be involuntary" but "it was never deemed to be false" [Doc. # 57, p. 42]. Respondent argues, in essence, that this Court cannot consider Guidry's confession to be "false" because "the fact that the Court in Guidry's case made a particular credibility determination does not render the testimony of the officers taking Guidry's confession false in this case" [Doc. # 57, p. 43]. Respondent views the Fifth Circuit's rejection of Guidry's confession as a "legal conclusion" that would not impact Prystash's case [Doc. # 57, p. 43].

The state courts found that Prystash did "not meet the first and second prongs of *Giglio*" because "[Prystash did] not show that the State presented false testimony at [his] trial that was material in that there was a reasonable likelihood that it affected the jury's judgment in finding the applicant guilty." S.S.H.R. at 551. The false-evidence materiality standard "is considered less demanding on a defendant than either the 'reasonable probability' or *Brecht* harmless-error standards." *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000).[15] False

---

[15]    The Fifth Circuit has expressed the difference between the two materiality standards as follows:

> We observe that different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence. The materiality standard for *Brady* claims, regardless of whether the defense made a specific or general request (or no request at all) for the withheld evidence prior to trial, is as follows: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Conversely, if the

(continued...)

evidence is "material" if there is "'any reasonable likelihood [that the false evidence could] have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  The Supreme Court has explained that this materiality standard "is equivalent to the *Chapman* [*v. California*, 386 U.S. 18 (1967)] harmless-error standard." *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985); *see also United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) ("[The false-evidence materiality standard] is the brother, if not a twin, of the standard ('harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless.").  Error is not harmless unless it "did not contribute to the verdict obtained."  *Chapman*, 386 U.S. at 24.

"To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial . . . ." *Yates v. Evatt*, 500 U.S. 391, 403 (1991).  Rather, the reviewing court must "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.*  To determine if the false evidence contributed to the jury's verdict, a court must weigh the "probative force" of the false evidence against the other independent evidence considered by the jury.  *Id.*  Only when the effect of the false evidence is "comparatively minimal" can a court find that it did not contribute to the verdict.  *Id.* at 405; *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (stating that under a *Chapman* review, the question is not whether a similar verdict would have been returned without the error, but whether the verdict was actually attributable to the error).

The Court need not reach the issue of whether Guidry's confession should be deemed

---

15      (...continued)
        prosecutor has knowingly used perjured testimony or false evidence, the standard is considerably less onerous: the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict.

        *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (footnotes and internal quotations omitted).

"false" testimony.[16]  Even if admission at Prystash's trial of Guidry's confession *per se,* or references to it, was error, the prosecution did not rely heavily on that evidence in its case against Prystash.  Independent of any information derived from Guidry's confession, the state courts found that the State presented "overwhelming evidence of [Prystash's] guilt." S.S.H.R. at 550.  Testimony about Guidry's confession was "sparse" in relation to "the same information found in Guidry's statements against penal interest being cumulatively presented through other witnesses, including [Prystash's] own statements."  *Id.* at 550.

The jury in Prystash's case faced a far different scenario than that considered by Guidry's jury.  Even if Prystash is correct and the prosecution suppressed evidence and presented false testimony, removing the gunman's confession from Prystash's trial does not materially weaken the prosecution's case.  Prystash provides this Court with no reason to discount his own confession and Gipp's testimony that corroborated his role as the middleman in the murder-for-hire of Farah.  Gipp's testimony described substantial material actions by Prystash and corroborated his intent in carrying out Farah's murder.  Specifically, Gipp testified concerning Prystash's participation in the murder and his expectation of being paid for his services.  The prosecution also corroborated Gipps' account with evidence independent of the confessions.  The prosecution traced the possession of the weapon presumably used to kill Farah from Fratta to Prystash to Guidry.  Witnesses saw a car resembling the one owned by Prystash leaving the crime scene.  Phone records showed communication between Fratta and Prystash around the time of the murder.  Another man related incriminating statements that Prystash made about the murder.  Even absent Guidry confession, "in the face of such compelling testimony, it is unlikely that the jury's ultimate determination would have been different."  *Moody,* 139 F.3d at 484 (5th Cir. 1998).[17]

---

[16]    The only falsity alleged is related to the circumstances under which Guidry's confession was obtained, *i.e.*, through trickery, not the substance of it.  The testimony relating to the voluntariness of Guidry's confession was minimal.

[17]    Under the *Brady* standard for materiality, the state habeas court found on successive
(continued...)

Given "the overwhelming quantity and quality of the other evidence in the record supporting the jury's verdict," *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995), the Court concludes that Prystash fails to meet the false-evidence materiality standard regarding the prosecution's use of evidence concerning Guidry's confession. Whether under AEDPA's deferential standard or a *de novo* review, Prystash has not shown entitlement to federal relief in this regard.

### E.    The FBI Complaint

Prystash's also argues in his first claim for relief that "[t]he State failed to disclose – and affirmatively denied the existence of – the complaint Prystash filed with the FBI concerning the physical abuse suffered at the hands of the officers which was in the State's possession. Rather than disclose this impeachment evidence, the State concealed the FBI complaint, and the prosecutor suggested to the court and jury it never existed . . . ." [Doc. # 52, p. 6]. Prystash consistently has asserted that the police physically abused him and violated his rights, particularly when the police interrogated him just days after Farah's murder. On November 18, 1994, police officers brought Prystash to the homicide division where Detectives Roberts and Valerio interrogated him for over thirteen hours. Prystash gave the officers a written statement denying any knowledge of, or involvement in, the murder. He also took a polygraph test. Unlike their interrogations of the other suspects, the police officers did not record their interview of Prystash. Prystash has since maintained that the police mistreated him throughout the November 18, 1994, interrogation.

---

[17]    (...continued)
habeas review that "Guidry's confession did not play a vital role in implicating [Prystash]; instead, [Prystash's] actions in front of Mary Gipp, his statements to Mary Gipp, Mary Gipp's admissions to the police, phone records, other inculpatory evidence, and [Prystash's] voluntary confessions played the 'vital role.'" S.S.H.R. at 550. The state habeas court added, "in light of the overwhelming evidence of [Prystash's] guilt," there was "no harm based on the sparse testimony during [Prystash's] trial concerning Guidry's confession and based on the same information found in Guidry's statements against penal interest being cumulatively presented through other witnesses, including [Prystash's] own statements." S.S.H.R. at 550.

On November 21, 1994, Prystash filed a civil rights complaint with the FBI alleging police misconduct.  S.S.H.R. at 476.  The FBI's report after its investigation provided a synopsis of Prystash's allegations:

> Victim states he was abused by Harris County Sheriff's Office Homicide detectives after being detained for approximately 14 hours regarding a murder in Houston.  Victim was handcuffed during questioning (too tight) and was hit in the chest and behind the ears.  Victim sustained minor scratches which did not need medical attention.

S.S.H.R. at 480.  The report observed that the FBI contacted the Harris County Sheriff's Department Internal Affairs Division about the incident.

During the subsequent FBI inquiry, an agent interviewed Prystash and prepared a report of Prystash's account.  Prystash is reported to have said that police pulled him over, pointed a gun at him, treated him roughly, and took him to the homicide office in handcuffs.  There, detectives allegedly "started popping his ears with his hands" and otherwise physically mistreating him.  Prystash claimed that the police never read him the *Miranda* warnings.  Before leaving the homicide office, Prystash complained, he saw that the police had taken several of his and Gipp's personal items.  When he returned home, Prystash found that the police had rummaged through his apartment, including through unopened Christmas presents.  S.S.H.R. at 486-91.  The report indicated that the agent observed some scratches on Prystash that would be consistent with his account.  *Id.* at 492.

In the end, nothing came of the FBI investigation.  The U.S. Department of Justice record that closed the case noted: "Federal criminal civil rights violation cannot be proven because:  No medical evidence to corroborate allegations.   [I]nsufficient independent eyewitness corroboration of allegations."  *Id.* at 518.

An important aspect of trial counsel's strategy was to demonstrate that the police officers investigating the murder were abusive and overreaching in their investigation, arrest, and interrogation of Prystash.  By casting doubt on the integrity of the police work, trial counsel hoped the jury would disregard Prystash's confession.  Gipp's testimony at trial confirmed some of Prystash's allegations about police mistreatment.  For instance, Gipp

36

testified that, although she was out of town when the interrogation happened, she observed some things corroborating Prystash's account.  Gipp also saw a cut behind Prystash's ear.  Tr. Vol. 17. at 223.  She reported that Prystash had filed an FBI complaint about the mistreatment.  *Id*. at 224.

Gipp treated the event as  part of a long period of police harassment.  Gipp testified that they "were harassed so much" *Id*. at 229.  She testified that Prystash informed her about filing a complaint with the FBI: "He said that he had gone down to file a complaint against the officers . . ." *Id*. at 244.  Gipp explained that "[t]he detectives followed us around, pulled [Prystash] over several times, handcuffed him, and said he wasn't under arrest and all kinds of real crazy things." *Id*. at 229.  Gipp said that the police searched her house and car without a warrant.  *Id*. at 227.  The police came to Gipp's house "night after night . . . to ask more questions" while Gipp "drank bottle after bottle of wine sitting there with them." *Id*. at 228.

On cross-examination, the prosecutor asked Gipp questions suggesting that Prystash did not actually file an FBI complaint.  For example, the prosecutor asked: "So the FBI or whatever agency this is going to have some record of this complaint; aren't they."  Gipp replied, "Yes."  The prosecutor then followed: "And [trial counsel] can bring it down here; can't they, Mary?" *Id*. at 244-45.

Police officers denied abusing Prystash during interrogations and denied having any knowledge of the FBI complaint.  Tr. Vol. 18 at 579.  During closing argument, the defense argued that there were "constitutional irregularities" in the case starting with "November 8, 1994, there is an FBI probe."  Tr. Vol. 20 at 845-46.  The prosecutor, however, interrupted: "I object.  There is no FBI probe." *Id*. at 846.  The prosecutor later argued that there was no evidence that the police treated Prystash roughly, calling his allegations "just blowing smoke."  *Id*. at 884.  The prosecutor, however, did not remember that during the pre-trial suppression hearing officers, including Sergeant Billingsley, admitted that they knew about the FBI complaint.  Tr. Vol. 3 at 60, 62, 175-76.

Prystash complains that the prosecution suppressed the FBI complaint and presented false testimony relating to it.  Respondent makes two primary arguments for summary

judgment on this claim.  First, Respondent contends that the State cannot have suppressed the FBI complaint because it originated with Prystash himself.  The Fifth Circuit has explained that "evidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it."  *United States v. Runyan*, 290 F3d 223, 246 (5th Cir. 2002) (internal quotations omitted).  "*Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence.  When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation."  *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (citations omitted).  While the principles are correct, the Court is unpersuaded Respondent's argument entitles him to summary judgment.  Prystash obviously knew about his own FBI complaint, but the State's denial of the FBI investigation's existence was the falsity; proof of the police's acknowledgment of the investigation was not "equally available" to him.  Contradictory, indeed, erroneous, testimony and argument about the FBI investigation dampened its impact in Prystash's favor.

More persuasively, Respondent argues that the FBI complaint was not material for purposes of *Brady* and *Giglio*.  Prystash's argument that evidence about the FBI complaint "would have enabled [trial counsel] to confirm [his] claim of coercion . . .," [Doc. # 52, p. 47], misses the mark.  The existence of the complaint and report does not necessarily address the question of whether the police mistreated him.  Rather, the FBI report would merely have verified a relatively minor point – that he had complained to the FBI about police mistreatment, a matter to which Gipp already had testified, and thus confirmed that Prystash's allegations of abuse were not of recent vintage.

Production of Prystash's FBI complaint or the FBI report, in fact, easily could have undermined the defense.  Neither document contains any *official* condemnation of Harris County police work; nor do they verify that misconduct tainted Prystash's interaction with the police.  To the contrary, the FBI report takes the question of police misconduct out of abstraction and concludes that no evidence supported Prystash's allegations.  The FBI report

likely would have added weight to the State's argument that the police had not engaged in misconduct.  Because the report shows no more than that Prystash complained about mistreatment, no reasonable probability exists that Prystash's complaint to the FBI or the agency's report of its investigation would have changed the outcome of Prystash's trial.

For those reasons, the Court finds that Prystash has not shown constitutional error relating to the his complaint or the FBI report.  The Court will deny habeas relief on Prystash's first ground for relief.

### F.    Conclusion

The State has retried both Fratta and Guidry without Guidry's illegal confession and each of these men again was convicted of capital murder.  Both are again on death row. While it may seem unfair for those individuals' convictions to have been overturned while Prystash's remains, the unique circumstances of Prystash's trial cast his case in a materially different legal light than from the records in his co-conspirators' cases.  This Court does not condone the police's overreaching regarding Guidry's confession, but contamination from that illegality did not impact Prystash's case in a way that warrants federal habeas relief.

## II.   CONSTITUTIONAL VIOLATIONS IN THE PROSECUTION'S USE OF PEREMPTORY CHALLENGES (CLAIM TWO)

Prystash claims that the State improperly used peremptory strikes to remove all African-American prospective jurors from the venire.[15]  Under *Batson v. Kentucky*, 476 U.S. 79 (1986), the prosecution violates the equal protection clause when it strikes potential jurors solely on the basis of race.  *Batson* jurisprudence has established a three-step burden shifting scheme to ascertain the State's intent when striking members of a protected category:

First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the

---

[15]    Although he objects to the dismissal of African-American prospective jurors, Prystash is Caucasian.  *See Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (holding that under the Equal Protection Clause, a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race).

basis of race.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).  Before turning to the substance of Prystash's *Batson* claim, the Court must consider whether he has presented it in a manner sufficient for federal review.

### A.    Procedural Bar

Prystash first advanced a *Batson* claim in his federal habeas petition.  When this Court stayed the case for the exhaustion of state remedies, the TCCA applied the stringent abuse-of-the-writ provisions of article 11.071, § 5(a), of the Texas Code of Criminal Procedure, and did not authorize Prystash to include the *Batson* claim in his successive state habeas application.

Prystash's failure to present his *Batson* claim to the state court in a procedurally actionable manner bars federal review unless he can overcome the resultant procedural bar.  Prystash makes two arguments to allow full federal review: (1) *Batson* claims are not subject to waiver, and consequently not susceptible to a procedural bar and (2) state habeas counsel's failure to raise the *Batson* claim forgives the procedural bar under the *Martinez/Trevino* line of cases.  Neither argument allows the Court to reach the merits.

First, Prystash argues that "[a]lthough discrimination in jury selection may affect the defendant's right to trial by an impartial jury, the venire member's rights under the Equal Protection Clause are the primary rights at issue in the *Batson* line of cases" [Doc. # 52, p. 72].  Therefore, he argues, a capital defendant cannot "waive the venire member's rights" and a defendant cannot "waive[] his *Batson* challenge" [Doc. # 52, p. 73].  Courts, however,

have routinely held that an inmate may waive his ability to raise a *Batson* claim by failing to make a timely, and adequate, trial objection. *See Williams v. Cain*, 31 F. App'x 835 (5th Cir. 2002) (recognizing a procedural bar when the habeas petitioner failed to raise a contemporaneous objection under *Batson*); *see also Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 561-62 (5th Cir. 2001) ("A party that does not raise facts or make timely *Batson* claims in the district court waives the right to raise them on appeal."). Similarly, courts have routinely found that *Batson* claims are subject to the exhaustion and procedural bar doctrines. *See Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (applying procedural bar).

Second, Prystash argues that he can show cause and prejudice to overcome the procedural bar under *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, ___ U.S.___, 133 S. Ct. 1911 (2013). In *Martinez*, the Supreme Court concluded that ineffective assistance by a state habeas attorney may amount to cause where state procedural law requires that an ineffective assistance of trial counsel claim be raised in an initial state habeas application. In *Trevino*, the Supreme Court extended *Martinez* to cases handled by Texas courts. To meet *Martinez*'s "cause" exception, the applicant must show that the representation provided by his state habeas counsel fell below the standards established in *Strickland* and that his underlying ineffective assistance of trial counsel claim "is a substantial one, which is to say . . . that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. The applicant must also show actual prejudice. *See Martinez*, 132 S. Ct. at 1321 (remanding to the court of appeals to "address the question of prejudice"); *see also Canales v. Stephens*, 765 F.3d 551, 568 (5th Cir. 2014).

*Martinez*, by its own terms, announced a "narrow exception" that applies only with respect to "cause for a prisoner's procedural default of a claim of *ineffective assistance at trial*." 132 S. Ct. at 1315 (emphasis added). Prystash argues that "there is no reason to think that the standard employed in *Martinez* and *Trevino* is limited solely to claims involving ineffective assistance of counsel" [Doc. # 52, p. 31]. On the contrary, the Fifth Circuit has refused to apply *Martinez* to "claims [that] do not pertain to the effectiveness of counsel." *Vasquez v. Stephens*, 597 F. App'x 775, 778 (5th Cir. 2015); *see also Wilkins v. Stephens*,

560 F. App'x 299, 306 n.44 (5th Cir. 2014); *Reed v. Stephens*, 739 F.3d 753, 778 (5th Cir. 2014). Under current circuit authority, *Martinez* cannot allow review of Prystash's defaulted *Batson* claim.[16]

Accordingly, the Court finds that a procedural bar precludes federal review of Prystash's *Batson* claim. In the alternative, the Court briefly discusses the substance of this claim.

## B.    <u>Alternative Review of the Merits</u>

In this case, the parties used their peremptory strikes after questioning all potential jurors. The State used five of its fourteen peremptory strikes to eliminate the African-American venire members in the jury panel. Tr. Vol. 16 at 1677-78. Trial counsel objected that "every black panelist was stricken" from the venire. *Id*. at 1678. Trial counsel, however, did not elaborate on each strike of the African-American potential jurors. Instead, trial counsel stated: "especially we are calling to the Court's attention of the strike of juror Ms. Merchant . . . ." *Id*. at 1678.[17]

The trial court called on the State to provide a race-neutral explanation for the use of the peremptory strike against the juror specifically identified by Prystash. "Once a court has taken that step, we no longer examine whether a prima facie case exists." *United States v. Webster*, 162 F.3d 308, 349 (5th Cir. 1998). Under the second part of the *Batson*

---

[16]    Even if *Martinez* and *Trevino* applied in this instance, Prystash's briefing concerning habeas counsel's ineffective representation does not satisfy the Fifth Circuit's rigorous standard on his *Batson* claim. A "*Martinez* argument is not properly raised or briefed by [an inmate's] passing references to the case without explanation of how the elements of *Martinez* are satisfied." *Young v. Stephens*, 795 F.3d 484, 493 (5th Cir. 2015). It is noted also that Prystash does not assert that trial counsel's ineffective representation should forgive the procedural bar regarding his *Batson* claim.

[17]    Prystash now argues that the State improperly used peremptory strikes against the other four African-American prospective jurors. Because trial counsel did not make a specific objection to their dismissal, the State did not have an opportunity to provide race-neutral explanations for their removal. These strikes have not been presented properly for any habeas review.

burden-shifting scheme, the State must provide a race-neutral justification for its strike. Because of trial counsel's emphasis, the State provided an explanation only for why it struck Ms. Merchant:

> Judge, the reasons that we struck her were that she was very wishy-washy on two. She believed the middle man deserved the death penalty.
>
> She kept saying depends on the circumstances and would never commit and [she] even said that there were a set of circumstances out there where she could see herself giving the death penalty to the point where I gave up on the question because I couldn't get her to say it.

*Id*. at 1679. The prosecutor added:

> Yeah. She struck me as someone whose [sic] already got her mind made up about almost everything you talked to her about. She's only 20 years old and has had a lot of different sort of life experiences than most 20-year-old had. And she seemed to me she wanted to be on the jury.
>
> It wasn't so much why, but she definitely has her mind made up about everything that you would ask her about.

*Id*. at 1680.

A "race-neutral explanation tendered by the proponent need not be persuasive, or even plausible." *United States v. Huey*, 76 F.3d 638, 641 (5th Cir. 1996). Indeed, the explanation "simply must be race-neutral and honest." *United States v. Webster*, 162 F.3d 308, 349 (5th Cir. 1998). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991). "In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." *Miller-El*, 537 U.S. at 339.

In this case, the trial court agreed with the prosecution and stated that Ms. Merchant seemed like the type of person who "already have their minds made up." Tr. Vol. 16 at 1680. The trial court, therefore, found the strike against her "to be not motivated by color and as a result [the trial court] permit[ed] . . . the peremptory strike of Ms. Merchant to stand." Tr. Vol. 16 at 1680. The trial court asked trial counsel: "Anything else we need to get in the

record?"  Trial counsel answered: "I don't think so."  Tr. Vol. 16 at 1680-81.

The trial court thus did not merely accept the prosecution's race-neutral explanation, it affirmed that its own observations of the potential juror comported with the prosecution's justification.  This federal court must defer to the trial judge's implicit determination that the prosecution's explanation was credible.  *See Woodward v. Epps*, 580 F.3d 318, 336 (5th Cir. 2009) ("Because of the importance of demeanor and credibility evidence in making such determinations, we give strong deference to the determination of the trial judge, consistent with AEDPA.").

Under *Batson*'s final step, Prystash ultimately bears the burden of establishing that the government engaged in "purposeful discrimination" based on race.  *Purkett*, 514 U.S. at 767; *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993).  Prystash attempts to prove his case by demonstrating that the reasons offered by the State lacked meaningful support.  However, even if the reasons advanced by the State are only weakly supported by the record, the thrust of this Court's inquiry is whether the State had racially biased intent in using the peremptory strike.  *See id.* at 1373-74 (stating that as a general rule, "[t]here will seldom be any evidence that the claimant can introduce–beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities").  Prystash has not identified evidence or argument persuasively supporting his contention that there was purposeful race-based discrimination.  The record does not support a finding that the prosecution engaged in purposeful discrimination.

Accordingly, Prystash has not shown entitlement to relief on the merits even if he had presented his *Batson* claim in a procedurally actionable manner.

## III.    TRIAL COURT'S LIMITATIONS ON THE TESTIMONY OF A DEFENSE EXPERT WITNESS (CLAIM THREE)

Prystash argues that the trial court denied him a fair trial by limiting the testimony of an expert witness during the punishment phase.  This claim has been exhausted in state court and the AEDPA governs this Court's review.

As one aspect of the defense's efforts to convince jurors that Prystash would not be

a future threat to society, trial counsel called Dr. Walter Quijano as a witness.  Dr. Quijano is "a doctor of clinical psychology who had spent five of his twenty-one year professional career as the Director of Psychiatric Services and Chief Psychologist at the Texas Department of Corrections," and who subsequently "maintained a full-time private practice which included working with juvenile and adult probation departments and conducting evaluations with the Texas Rehabilitation Commission" [Doc. # 52, p. 76].  The defense anticipated that Dr. Quijano would testify that Prystash would not be a continuing threat while incarcerated.  Dr. Quijano based his opinion on several factors, including his knowledge of the prison resources used to control violence and Prystash's pre-trial classification as nonviolent.

The parties have not identified in the record any objection to Dr. Quijano's testimony by the State.  Nor have the parties explained why the trial court required Prystash to make an offer of proof relating to Dr. Quijano's testimony outside the jury's presence.  For whatever reason, the parties questioned Dr. Quijano in the trial judge's chambers as a predicate to his testimony coming before jurors.

"[O]utside the presence of the jury, [Prystash] made a proffer of the testimony of Walter Quijano, psychologist, concerning [Dr. Quijano's] work in the Texas prison system, his familiarity with the Texas prison system classification, his review of [Prystash's] records and facts of the offense, possible use of jail record[s] and other data to help determine an inmate's classification, and [Dr. Quijano's] opinion that it was 'less likely or not likely' that [Prystash] would be a continuing threat in prison."  S.H.R. at 189.  Dr. Quijano said that during Prystash's pre-trial detention "the jail does not classify [Prystash] as violent and dangerous in the jail.  Classified his crime, of course, as assaultive violence."  Tr. Vol. 22 at 1236.  Dr. Quijano clarified that "[i]n the jail, he's classified as nonviolent."  *Id.*

Dr. Quijano testified *in camera* that, in his opinion, Prystash would not be a continuing threat to society and that, even if he posed some threat, the prison system would be able to manage him.  Tr. Vol. 22 at 1235-36.  On cross-examination, however, Dr. Quijano clarified that he had not talked to Prystash personally.  Tr. Vol. 22 at 1236-37.  Also,

Dr. Quijano could not predict what classification Prystash would receive because "[t]hat would be the job of the Classification Committee." Tr. Vol. 22 at 1236-37.

The trial court permitted Dr. Quijano to testify before the jury because of his experience with prison classification and about prison resources, but ruled that the witness could not engage in speculation about what classification Prystash would receive in TDCJ. Tr. Vol. 22 at 1238. Also, the trial court allowed Dr. Quijano to describe his review of Prystash's jail records, but not Prystash's current jail classification. Tr. Vol. 22 at 1239.

The defense called Dr. Quijano as its last witness before the jury. The defense asked Dr. Quijano questions resulting in generalized testimony about the prison system and its ability to curtain violence. Tr. Vol. 22 at 1255. Dr. Quijano explained that the prison system had "sufficient resources to control inmates' dangerousness." Tr. Vol. 22 at 1255. Trial counsel did not particularize the testimony by asking Dr. Quijano if he considered Prystash to be a future societal threat.

On direct appeal, Prystash argued that the trial court abused its discretion by limiting Dr. Quijano's testimony. The TCCA observed that "[t]he testimony of Dr. Quijano concerning the prison classification system was not particularized to [Prystash], and Dr. Quijano did not establish that the current jail classification would dictate his classification in prison." "The trial court prohibited Dr. Quijano from hypothesizing as to the application of the prison classification system" because "Dr. Quijano stated that he was unable to predict the classification that the prison system would assign . . . ." Thus, Prystash could not "complain about the restriction of the trial court on the application of the prison classification system to [Prystash] because Dr. Quijano had no opinion as to that application." *Prystash v. State*, 3 S.W.3d 522, 528 (Tex. Crim. App. 1999).

The TCCA also found that the proposed testimony about Prystash's jail classification "was inadmissable hearsay."[18] Prystash suggested that by precluding reference to certain

---

[18]     The TCCA stated:

(continued...)

46

factors, such as the current jail classification, the trial court's ruling undercut Dr. Quijano's ability to testify about Prystash's future dangerousness. The TCCA, nevertheless, emphasized that, despite the limitations, "[n]ever did the trial court prevent Dr. Quijano from stating his opinion of the continuing threat posed by [Prystash]." The TCCA held:

> [t]he notion that Dr. Quijano was unable to testify that he thought [Prystash] did not pose a continuing threat without also stating the current jail classification is without merit, because the trial court permitted Dr. Quijano to state that he had reviewed the jail records. Dr. Quijano testified that the prison system had sufficient resources to control the dangerousness of the inmates. Dr. Quijano was free to elaborate as to the threat posed by [Prystash], but [Prystash] never inquired beyond this general question. The trial court never prevented defense counsel from asking Dr. Quijano if he thought that [Prystash] posed a continuing threat.

*Prystash v. State*, 3 S.W.3d 522, 528-29 (Tex. Crim. App. 1999).[19]

On federal review, Prystash argues that under *Barefoot v. Estelle*, 463 U.S. 880 (1983), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the trial court's limitations on Dr. Quijano's testimony unconstitutionally impaired his ability to present mitigating evidence. In *Eddings*, the Supreme Court held that a capital jury cannot "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less

---

[18]     (...continued)
The jailer's opinion of the dangerousness of [Prystash] was hearsay because it was a statement not made by Dr. Quijano that would have been offered to prove the truth of the matter asserted, that the defendant was not dangerous." However, because "the opinion of an expert witness may be informed by the opinion of others" the trial court properly limited Dr. Quijano's testimony to describing his review of the pretrial classification.

*Prystash*, 3 S.W.3d at 529.

[19]     Prystash raised a similar challenge on state habeas review. The state habeas court relied on the disposition of the issue on direct appeal and denied relief for the same reasons. S.H.R. at 196-97.

than death." 455 U.S. at 110.  The Supreme Court in *Barefoot* cautioned that testimony by psychologist predicting dangerousness is not "generally so unreliable that it should be ignored." 463 U.S. at 899.

The state courts gave two reasons for limiting Dr. Quijano's testimony.  First, the state courts ruled that Dr. Quijano could not testify about Prystash's current classification because that fact rested on hearsay.  The Supreme Court has held that it is "clear" and "well established" that the "sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quotation omitted).  However, the Supreme Court "certainly did not federalize the law of evidence," *Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983), and questions about the admissibility of evidence are generally left to the sound discretion of state courts.  *See Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).  "In reviewing state evidentiary rulings," a federal court's role "is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness." *Evans v. Thigpen*, 809 F.2d 239, 242 (5th Cir. 1987).  Only those state law violations that played a "crucial, critical, and highly significant" role in the trial will offend the due process clause. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).  Absent an extreme due process violation, the improper application of state law cannot serve as the basis for habeas relief.

The Fifth Circuit has specifically stated that the prohibition against hearsay "is not abrogated in the context of capital sentencing . . . ." *Watts v. Quarterman*, 244 F. App'x 572, 576 (5th Cir. 2007).  Prystash does not dispute that the state court's finding that the testimony would have been hearsay; instead, he contends that "Dr. Quijano's testimony regarding Prystash's jail classification was unquestionably relevant and certainly did not constitute speculation as it was based directly on the content of the jail records and Dr. Quijano's review of the records (a fact to which Dr. Quijano was allowed to testify)" [Doc. # 52, p. 83]. This Court does not decide whether the proposed testimony should have been admitted under state evidentiary rules.  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Also, there has not been a showing that the questioned exclusion was so grossly unfair as to taint his entire trial or the punishment phase.

Second, the state courts found that Dr. Quijano engaged in speculation about how the prison authorities would classify Prystash if he received a life sentence. Dr. Quijano himself explained that he could not predict Prystash's possible classification. Tr. Vol. 22 at 1236-37. The trial court, nonetheless, allowed Dr. Quijano to testify in general terms about his opinion of Prystash's future dangerousness or this threat to others while incarcerated. Trial counsel did not ask that question.

Prystash has not shown that the state court failed to follow its own law in limiting Dr. Quijano's testimony or that the limitation rendered the trial fundamentally unfair. The Court concludes that Prystash has not shown that the state court's denial of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## IV.    PREJUDICIAL AND INFLAMMATORY CRIME SCENE PHOTOGRAPHS (CLAIM FOUR)

Prystash contends that "the introduction of unfairly prejudicial, cumulative, and irrelevant photographs into evidence" denied him a fair trial [Doc. # 52, p. 85]. Prystash exhausted this claim in state court.

Under Texas law, "photographs are admissible regardless of their inflammatory nature if they are competent, material, and relevant, and unless they are offered solely to inflame the minds of the jury." *Woods v. Johnson*, 75 F.3d 1017, 1038 (5th Cir. 1996). Prystash complains about two groups of photographs that the State put before the jury. In the first group, the State introduced into evidence photographs of the crime scene, some of which included Farah's body. Tr. Vol. 18 at 374-75. Prystash argued that the photographs were not relevant to any issue in the case, their prejudicial effect outweighed their probative value, and that one of them was gruesome. In the second group, the State introduced autopsy photographs depicting the victim's gunshot wounds that Assistant Medical Examiner Vladimir Parungao described during his trial testimony. Tr. Vol. 19 at 764-66. Prystash argued that the autopsy photographs were gruesome and that they were more harmful than

helpful.  The trial court overruled Prystash's objection to both sets of photographs and received them into evidence.  Tr. Vol. 18 at 375; Vol. 19 at 769-70.

The state habeas court found that the trial court did not abuse its discretion in the admission of the challenged photographs.  S.H.R. at 194.  The state habeas court found that the photographs "depicted . . . events about which witnesses testified," were "probative to the State's theory of the offense," and that the probative value that was not outweighed "substantially by any prejudicial value."  S.H.R. at 194.  Prystash must show that the state court's adjudication of this claim was contrary to, or an unreasonable application of, federal law.

State law matters, such as the admission of evidence, generally do not serve as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  "The Fifth Circuit has specifically held that graphic crime scene photographs do not offend due process principles" when they "serve[ ] to illustrate and make more understandable the officers' testimony which described the [scene] and its condition, and the location and condition of the deceased's body and the nature and extent of the injuries to the deceased." *Woods*, 75 F.3d at 1039.  Although some of the photographs in this case were quite gruesome, the United States Constitution does not require the prosecution to use the least inflammatory photographs available.  Indeed, truly relevant photographs are admissible regardless of their inflammatory nature. *See Woods*, 75 F.3d at 1038-39.

The photographs in issue had a modicum of probative value and did not mislead the jury or misrepresent facts.  The trial was not rendered legally unfair by their introduction and the state court's determination was not unreasonable.

## V.   INEFFECTIVE ASSISTANCE OF TRIAL, APPELLATE, AND HABEAS COUNSEL (CLAIM FIVE)

Prystash complains that he received constitutionally ineffective representation at the

trial, appellate, and state habeas levels of review. Prystash raised most his ineffective-assistance-of-counsel arguments for the first time on federal review. Because the TCCA did not authorize successive proceedings on any ineffective-assistance claim when this Court stayed the case, Prystash's arguments face a procedural bar. Prystash contends that he can overcome the procedural bar under *Martinez* and *Trevino* because state habeas counsel did not advance his claims previously. The Court finds, however, that Prystash does not provide an actionable basis for federal review.

Whether his claim attacks efforts by his trial, appellate, or habeas counsel, *Strickland v. Washington*, 466 U.S. 668, 686 (1984)*,* provides the general conceptual framework for judging an attorney's representation. Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

"[T]he perspective of hindsight" often leads to a "natural tendency to speculate as to whether a different trial strategy might have been more successful." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). *Strickland* jurisprudence affords a counsel's efforts a significant level of deference because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, 562 U.S. at 106 (quotation omitted). Thus, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. 668, 689 (1984). The law honors an attorney's "conscious and informed decision on trial tactics and strategy," allowing for federal relief only when "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003).

With that deference, courts "must be particularly wary of arguments that essentially

51

come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (internal quotation marks omitted).  An inmate raising an ineffective-representation claim must rely on more than complaints and conclusory statements.  Conclusory allegations, unsupported by the record or sufficient detail, provide an insufficient basis for a *Strickland* claim.  *See Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) ("[M]ere conclusory allegations on a critical issue are insufficient to raise a constitutional issue.").  Instead, a "claim of ineffective assistance of counsel must be stated with specificity; conclusory allegations are insufficient to raise a constitutional issue." *United States v. Whitehead*, 393 F. App'x 226, 227 (5th Cir. 2010); *see also United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.").  "In the absence of a specific showing of how [an attorney's] alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial, [a court can find] no merit to these [claims]." *Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992).

### A.    Trial Counsel

Prystash raises five challenges to trial counsel's representation.  Prystash exhausted the first two arguments in his initial state habeas application; AEDPA review governs those claims.  The TCCA refused to authorize successive state review of the remaining three, which results in a procedural bar to this federal court's consideration of their merits. Prystash provides only cursory briefing on each allegation against trial counsel. In this posture, the ineffective-assistance-by-trial-counsel claims do not warrant federal habeas relief.

The Court nevertheless addresses each argument.

### 1.    Introduction of Guidry's Confession into Evidence

Prystash complains that trial counsel provided deficient representation by introducing

into evidence the arrest warrants that ultimately led to the jury hearing Guidry's confession.[20]
Prystash argues that if "the confession itself had been offered by the State, it, presumably,
would not have been admissible, as its disclosure to the jury would have violated Prystash's
constitutional right to confront the witnesses against him" [Doc. # 52, p. 89].

Prystash raised this claim on state habeas review.  S.H.R. at 23-24.  Trial counsel
provided an affidavit in response to Prystash's disagreement with the introduction into
evidence of the arrest warrants and supporting affidavits.  Trial counsel emphasized the
defense's dual approach to the guilt/innocence phase: (1) trying to convince the jury to
disregard Prystash's statement by arguing that unconstitutional police action forced him to
confess and (2) minimizing Prystash's role in the case by emphasizing that Guidry was the
actual shooter.  S.H.R. at 202.  Trial counsel explained why the defense offered the warrants
into evidence:

> I chose to admit State's 96 and 97, two "pocket warrants" for the arrest of
> Prystash dated March 8 and March 10, 1995, into evidence in an attempt to
> impeach the police officers' testimony concerning the circumstances of Joseph
> Prystash's arrest.  My effort was to try to explain to the jury how the police
> were playing games with Prystash, because the police had two warrants but
> attempted to "make friends" with him and did not arrest him until March 13,
> 1995.  The appellate record will reflect my repeated questions to Sgt. Roberts
> and Sgt. Billingsly concerning the procedures the police used with the first and
> second "pocket" warrants, including the police initially not placing him in jail
> when the first warrant was executed, the length of time he was questioned after
> the execution of the second warrant, the circumstances of the questioning, how
> many times he was questioned, the police's intent to arrest Prystash on March
> 8, 1995, and about the procedures of Prystash's questioning.  The majority of
> the information contained in the arrest warrant affidavits was also in Prystash's
> statement which was admitted into evidence.

S.H.R. at 203.

The state habeas court found trial counsel's explanation credible.  S.H.R. at 188.

---

[20]     During Detective Robert's cross-examination, "trial counsel, not the State, introduced
into evidence State's Exhibits 96 and 97, [Prystash's] two arrest warrants, including
the affidavits. . . ."  S.S.H.R. at 548-49.

Also, the state habeas court found that the information contained in Guidry's confession was merely cumulative of that found elsewhere in the record.  S.H.R. at 188.  On that basis, the state habeas court concluded that "[t]rial counsel are not ineffective for pursuing the reasonable trial strategy of attempting to impeach the police officers' testimony concerning the arrest of [Prystash] by introducing State's Exhibits 96 and 97. . . and attacking the circumstances of [Prystash's] arrest warrants, arrest, questioning, and confession."  S.H.R. at 195.  The state habeas court particularly noted that the information in the warrants was "corroborated in other portion's [sic] of [Prystash's] trial, including [his] own statements." S.H.R. at 195.

Prystash makes no effort to show that the state habeas adjudication was contrary to, or an unreasonable application of, federal law.  Because a petitioner must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or actual prejudice will ordinarily make it unnecessary to examine the other prong.  *See Strickland*, 466 U.S. at 700; *Ransom v. Johnson*, 126 F.3d at 716, 721 (5th Cir. 1997).  The state habeas court concluded that Prystash had not shown *Strickland* prejudice because Guidry's confession was merely cumulative of other trial evidence.  S.H.R. at 188.  Specifically, the state habeas court found,

> based on the evidence elicited at trial, that the information contained in the affidavits of State's Exhibits 96 and 97, introduced into evidence by counsel, was presented in the following other parts of [Prystash's] trial: [Prystash's] statements; Mary Gipp's testimony as to [Prystash's] involvement in the offense with co-defendants Robert Fratta and Howard Guidry; testimony corroborating the phone calls made on the night of the offense; the State's investigation revealing that Guidry was a suspect; Guidry's possession of codefendant Fratta's gun; and, Billingsley's testimony about his March 8, 1995 conversation with [Prystash].

S.H.R. at 188.  The more detailed account of the murder-for-hire from Prystash's own confession and Gipp's testimony echoed, and made commutative, Guidry's confession that the police officers used to establish probable cause for the warrants.  Thus, the addition of the warrants and accompanying affidavit to the trial record did not have a meaningful

prejudicial effect.  Given the law and facts of record, Prystash has not shown that the admission of the warrants into evidence created a reasonable probability of a different result. Prystash has failed to meet his AEDPA burden on this issue.

### 2.    Gipps' Testimony

Prystash complained on state habeas review that trial counsel should have objected when Detective Roberts "was permitted to testify that Mary Gipp – who could have been and indeed was called as a State witness – told him that Howard Guidry was involved in the Fratta shooting and that Guidry was in jail for bank robbery" [Doc. # 52, p. 90].  *See* Tr. Vol. 18 at 465-67 (Detective Roberts' testimony).  The state habeas court, however, found that Detective Roberts' testimony was not inadmissible hearsay under state law because it "was not offered for the truth of the matter but was an explanation of how the police arrived at a suspect in the offense."  S.H.R. at 194-95 (citing *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995).  Accordingly, the state habeas court found that "[c]ounsel cannot be considered ineffective for lack of objection to Roberts' proper testimony."  S.H.R. at 195.

The Constitution does not require counsel to make futile motions or objections.  *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002).  Prystash does not show that the state habeas court was wrong in its assessment of Texas evidentiary law.  Nor does he establish that state evidentiary rulings are subject to federal habeas review.  *See Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010).  More significantly, Prystash has not shown prejudice from the questioned testimony by Detective Roberts.  The information was merely cumulative of Gipp's own testimony presented later in the trial.  Prystash has not demonstrated that the state court was wrong, much less unreasonable, in finding no *Strickland* error.  Prystash fails to meet his AEDPA burden on this issue.

### 3.    Mental Health Evidence

Prystash raises a procedurally barred complaint about trial counsel's investigation into Prystash's mental health.  Prystash argues that "trial counsel failed to conduct a thorough investigation into mitigating factors relevant to the jury's consideration of punishment," particularly because "trial counsel failed to engage and properly consult with a mental health

professional" [Doc. # 52, pp. 90, 93].  Prystash specifically complains that "[t]he jury never knew or even heard any evidence regarding Prystash's poor mental health, including prior diagnoses of schizophrenia, below average IQ, and potential fetal alcohol syndrome. (*See* letter attached as Exhibit B)" [Doc. # 52].  Prystash did not attach any exhibit to his amended petition.  In an earlier version of his petition, however, Prystash did attach a letter that trial counsel apparently received during trial preparation.  From the letter's contents, it appears that trial counsel arranged for a licensed psychologist to interview Prystash for three hours before trial, and thus engaged in some form of investigation into Prystash's mental health.

The psychologist stated in the letter that, from the interview, he "became acquainted with [Prystash's] history of multiple accidents and possible head injuries, as well as his years of use of various steroids and growth hormones" [Doc. # 15, Exhibit B].  The psychologist added:  "As all of these things may greatly impact one's neurological status and functioning," the psychologist recommended "a neurological evaluation, including EEG and MRI" and "neuropsychological testing to determine what functional limitations Mr. Prystash may have, if any."  *Id.*  The expert did not mention any earlier diagnosis of mental illness, low IQ, or fetal alcohol syndrome.

Prystash's allegations in the petition that his trial attorneys' investigation failed to uncover certain evidence of mental illness or disease is insufficient for a successful *Strickland* challenge.  A habeas petitioner "must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial."  *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *see also Greer v. Thaler*, 380 F. App'x 373, 386 (5th Cir. 2010); *Carty v. Quarterman*, 345 F. App'x 897, 903 (5th Cir. 2009); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006); *Duff-Smith. v. Collins*, 973 F.2d 1175, 1183 (5th Cir. 1992); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

In the case at bar, the record shows that trial counsel made some effort to pursue mitigating evidence relating to mental illness.  However, in connection with his habeas application, Prystash has presented no evidence that in fact he suffered from mental illness or neurological deficit in any respect, let alone a condition that would support exculpation

or mitigation.   The Court cannot speculate about unexplored areas of mental-health mitigating evidence or how such matters likely would have influenced jurors.  Prystash has failed to show deficient performance or prejudice under *Strickland* and the claim is rejected.

### 4.   Ballistics Testing

Prystash raises a procedurally barred argument that trial counsel was ineffective because the defense "failed to perform its own ballistics testing for the bullets that allegedly killed Farah Fratta" [Doc. # 52, p. 94].   Prystash, however, provides no reason that a reasonably effective attorney would have done so.   Prystash neither provides any specific reason for which ballistics testing was necessary nor briefs any error that flowed from its absence.   This claim fails under both the deficient performance and the prejudice prongs of *Strickland*.

### 5.   Dr. Quijano

Finally, Prystash raises a procedurally barred claim faulting trial counsel because Dr. Quijano, a psychologist, "was not permitted to testify to the future dangerousness of Prystash" as a result of trial counsel's failing "to schedule even one meeting between Prystash and the expert" [Doc. # 52, p. 95].  As previously discussed, however, the trial court did not limit Dr. Quijano's ability to discuss Prystash's future dangerousness; the court prevented Dr. Quijano from speculating about Prystash's possible future prison classification.[21]  Prystash has not established that one or more meetings between Dr. Quijano and Prystash would have changed the trial court's ruling on Dr. Quijano's testimony or, more importantly, would have affected the jury's assessment of Prystash's future dangerousness for sentencing purposes.   The Court denies this claim.

### B.   Appellate Counsel

In two paragraphs of argument, Prystash raises a procedurally barred claim alleging that his appellate attorney was ineffective for not raising specific issues.   The total of his

---

[21]     As the TCCA found: "Never did the trial court prevent Dr. Quijano from stating his opinion of the continuing threat posed [Prystash].  .  .  .  Dr. Quijano was free to elaborate as to the threat posed by [Prystash]." *Prystash*, 3 S.W.3d at 522.

ineffective-assistance-of-appellate counsel argument in his petition is that:

> Prystash's direct appeal counsel failed to raise any ineffective assistance of counsel claims; any claims related to Prystash's unconstitutionally-obtained confessions; any of the issues surrounding Guidry's unconstitutionally-obtained confession which was presented at trial; issues involving the State's *Batson* violations; and the State's *Witherspoon* violation.
>
> Although trial counsel was aware of the arguments surrounding Prystash's alleged confession – and, indeed, raised some of the arguments in the Motion to Suppress Confession – counsel nonetheless failed to raise any of them on appeal. The failure of direct appeal counsel to raise the issues involving Prystash's alleged confessions and other aspects of the State's case against him constitutes ineffective assistance of counsel, because there is a reasonable likelihood that the Texas Court of Criminal Appeals would have granted Prystash a new trial.

Petition [Doc. # 52], p. 95.

"Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998). Cursory allegations of error fail to provide a sufficient basis on which to find that appellate counsel provided deficient performance and that a reasonable probability exists that the result would have been different had counsel performed otherwise.

On the merits of the raised claims, however, there were significant hurdles even if asserted on direct appeal. At this federal habeas stage, despite meaningful procedural impediments, the Court has addressed many of the issues upon which Prystash bases his ineffective-assistance-of-appellate-counsel claim. The rest will be addressed in the discussions that follow. The Court has found no underlying claim with merit when reviewed under applicable standards. Thus, the law requires the denial of Prystash's ineffective-assistance-of-appellate-counsel claim.

### C.    State Habeas Counsel

Prystash also claims that ineffective representation by his state habeas attorney is grounds for federal habeas relief. In general, "no constitutional right to habeas counsel in state collateral proceedings exists, so [an inmate] cannot claim a constitutional violation."

*Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *see also Fairman v. Anderson*, 188 F.3d 635, 643 (5th Cir. 1999) ("[B]ecause appointment of counsel on state habeas is not constitutionally required, any error committed by an attorney in such a proceeding cannot be constitutionally ineffective."); 28 U.S.C. § 2254(i) (providing that the ineffectiveness or incompetence of counsel during state collateral post-conviction proceedings shall not be a ground for relief). Simply, "there is no constitutional right to competent habeas counsel." *Barraza v. Cockrell*, 330 F.3d 349, 352 (5th Cir. 2003). However, to the extent Prystash's claims of ineffective habeas representation relate to a showing of cause and prejudice to overcome a procedural bar, the claims will be considered. *See Martinez*, 132 S. Ct. at 1320 (observing that the *Martinez* Court's decision only allows "the ineffectiveness of [a] postconviction attorney to excuse his failure to comply with [a State's] procedural rules, not as an independent basis for overturning [an inmate's] conviction").

After careful consideration, the Court concludes that Prystash has not made a probative showing that his habeas counsel provided ineffective representation. To overcome a procedural bar, a petitioner must establish that "the claim should have been raised, [that state habeas counsel] was ineffective under the standards of [*Strickland*]" and that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." *Martinez*, 132 S. Ct. at 1318-19. Prystash's arguments address solely the first *Martinez* prong, essentially that habeas counsel failed to raise various claims. The record does not establish that counsel's omission constituted deficient performance as defined under *Strickland*, nor persuasive explanation that the identified errors or omissions were substantial enough to constitute cause under the procedural bar doctrine. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) (finding that "generalized allegations are insufficient in habeas cases" to meet the *Martinez* exception); *see also Smith v. Murray*, 477 U.S. 527, 535 (1986) ("'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.'" (quoting *Murray v. Carrier*, 477 U.S. 478, 486-87 (1986)). In any event, as explained elsewhere in this Memorandum, the Court has reviewed the ineffective-assistance

claims and the related arguments of prejudice, but has found no error of federal constitutional dimension.  Prystash has not shown actual prejudice to allow full review of his claims.

### D.    Conclusion of Ineffective Assistance Claims

Prystash has raised several arguments of ineffective assistance by his prior attorneys. Most of these claims were not presented to the state court in a procedurally proper manner, thus impeding federal review of their merits.  The Court, nevertheless, has reviewed the briefing, the record, the relevant law, and the particulars of counsel's alleged errors.  Taken individually or collectively, Prystash's arguments of error do not establish a reasonable probability of a different result under the *Strickland* standard.  The Court denies Prystash's ineffective-assistance-of-counsel claims.

## VI.    PRYSTASH'S SECONDARY CLAIMS

Prystash divides the claims in his federal petition into two groups: the "primary" and "secondary" arguments.  Prystash categorizes claims six through twelve as "secondary," which he candidly defines as "cogent arguments for the vacatur of Petitioner's conviction, yet may require an extension of the law" [Doc. # 52, p. 34].  As each secondary claim is foreclosed by procedural rules or substantial adverse precedent, the Court only briefly discusses these claims.

### A.    Removal of Prospective Jurors for Cause (Claim Six)

Prystash argues that his Sixth Amendment right to an impartial jury was violated when the State used peremptory strikes against jurors "who stated some opposition or equivocation on the death penalty" [Doc. # 52, p. 102].[22]  Under the jurisprudence flowing from *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Constitution does not allow the State to exclude *for cause* potential jurors who express mere hesitancy in their ability to sentence a

---

[22]    Prystash did not raise his *Witherspoon* claim in his initial state appellate or habeas proceedings.  The unehxausted nature of this claim procedurally bars federal review absent an adequate showing of cause and actual prejudice.  The lack of constitutional support for the claim precludes Prystash from showing actual prejudice to overcome the procedural bar.

defendant to death.  *See Morgan v. Illinois*, 504 U.S. 719, 732 (1992) (emphasis added); *see also Adams v. Texas*, 448 U.S. 38, 45 (1980).  The State did not ask for a for-cause dismissal of potential jurors who expressed hesitancy to impose a death sentence; the State removed them by peremptory challenge.  Prystash asks this Court to broaden the *Witherspoon* rule to disallow the peremptory strike of "jurors whom the State could not properly excuse for cause under *Witherspoon*" [Doc. # 52, p. 102].[23]

Other than the limited exceptions under *Batson* jurisprudence in which a strike would violate the Equal Protection clause, "[t]he essential nature of the peremptory challenge is that it is exercised without a reason stated, without inquiry and without judicial control."  *Swain v. Alabama*, 380 U.S. 202, 220 (1965); *see also Adams*, 448 U.S. at 48.  Given the discretionary nature of peremptory strikes, the Fifth Circuit has stated that the "[e]xercise of peremptory challenges . . . does not implicate *Witherspoon*."  *Sonnier v. Maggio*, 720 F.2d 401, 406 (5th Cir. 1983).  In fact, directly contrary to Prystash's argument, the Fifth Circuit has "'consistently held that in capital cases peremptory challenges may be used to exclude those [prospective jurors] who express hesitancy about imposing the death penalty but whose exclusion for cause is forbidden by *Witherspoon*.'"  *Andrews v. Collins*, 21 F.3d 612, 628 (5th Cir. 1994) (quoting *Sonnier*, 720 F.2d at 406); *see also Holland v. Anderson,* 230 F. App'x 374, 381 (5th Cir. 2007).[24]

Even if this Court were to grant Prystash's *Witherspoon* claim, the Court would be

---

[23]   To support this extension of the law, Prystash relies solely on a dissent from the denial of certiorari written by Supreme Court Justice William J. Brennan Jr. in *Brown v. North Carolina*, 479 U.S. 940 (1986).  Justice Brennan argued that the prohibition of race-based peremptory strikes from *Batson v. Kentucky*, 476 U.S. 79 (1986), should extend to prospective jurors for whom the State could not otherwise strike for cause under *Witherspoon*.

[24]   As Justice O'Connor stated in her opinion concurring to the denial of certiorari in *Brown v. North Carolina*, "[p]ermitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon*." 479 U.S. 940, 941 (1986) (O'Connor J., concurring).

creating a new rule of constitutional law in violation of *Teague v. Lane*.  Whether because of its procedural deficiencies or its novel constitutional footing, Prystash has not shown habeas relief is available to him on his *Witherspoon* claim.

## B.   Mitigating Value of Evidence about the Prosecution's Plea Offer (Claim Seven)

Prystash claims that the trial court violated his constitutional rights by limiting the presentation of mitigating evidence.  Before trial the prosecution offered Prystash a plea deal of "55 years on murder," in exchange for cooperation and his testimony against his co-defendants.  Prystash refused the plea offer.  Tr. Vol. 22 at 1172-77.  During the punishment phase, the defense tried to offer into evidence a letter from the District Attorney's Office detailing the plea offer.  The trial court excluded the letter "because he was concerned that if the plea agreement was made public, it might affect the trial of [Prystash's] co-defendant."  *Prystash*, 3 S.W.3d at 527.  Prystash complains that the trial court's ruling violated the Eighth Amendment by prohibiting jurors from considering mitigating evidence relevant to his sentence.

Prystash raised this claim on direct appeal.  The TCCA did not approve of the reason why the trial court excluded the letter.  The appellate court remarked that "[c]oncern for the impact on a subsequent trial should be dealt with in that case through the voir dire of prospective jurors, a continuance, or a venue change.  *Prystash*, 3 S.W.3d at 527 (citations omitted).  Assuming without deciding that this evidence is *"minimally* relevant to a State District Attorney's office belief that the defendant was not a future danger," *id*. at 527-28, the TCCA articulated several reasons for disallowing information about a rejected plea.  The TCCA stated "the probative value of such evidence is substantially outweighed by the danger of both unfair prejudice and of misleading the jury"; "[t]he multitude of motivations that a prosecutor may have in offering a life sentence in a capital case dilute the probative value of that offer and may mislead the jury as to the true motivations of the prosecutor"; "[p]ublic policy favors the conclusion of litigation by compromise and settlement . . . [and] introduc[ing] evidence about a sentence offered by the State during plea negotiations clearly

militates against this policy." *Id.* at 528 (citations omitted). The TCCA, accordingly, held that "[t]he decision to admit or exclude this evidence was soundly within the discretion of the trial judge." *Id.*

This Court's role on federal habeas review is not to ascertain whether the Texas courts should have admitted evidence of the plea bargain under Texas law. *See Schaetzle v. Cockrell*, 343 F.3d 440, 448-49 (5th Cir. 2003) ("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law."). This Court's role is only to decide whether the exclusion of the evidence was unreasonable in light of clearly established federal constitutional law. *See Simmons v. Epps*, 654 F.3d 526, 544 (5th Cir. 2011).

A capital defendant has a constitutional right to present mitigation evidence relating to "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The Supreme Court, however, has never preempted or federalized a State's ability to exclude some evidence under its traditional evidentiary framework. *See Nevada v. Jackson*, ___ U.S. ___, 133 S. Ct. 1990, 1992 (2013) ("[O]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."); *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) ("The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing procedures."). Trial courts retain "the traditional authority . . . to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604, n.12. In application, the Supreme Court has allowed trial courts to exclude as irrelevant punishment-phase evidence such as that involving alleged innocence or residual doubt. *See Oregon v. Guzek*, 546 U.S. 517, 523-24 (2006); *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) (plurality opinion).

The Supreme Court has not clearly established that evidence of unsuccessful plea negotiations is relevant for mitigation purposes. Indeed, some federal courts have specifically questioned whether failed plea negotiations are even relevant evidence. *See*

*Hitchcock v. Sec'y, Florida Dep't of Corr.*, 745 F.3d 476, 484 (11th Cir. 2014) (Courts are chary to "requir[e] the admission of rejected plea offers as mitigating evidence in capital cases" as it "could have the pernicious effect of discouraging prosecutors from extending plea offers in the first place, lest those offers come back to haunt them at sentencing."); *Wright v. Bell*, 619 F.3d 586, 598-601 (6th Cir. 2010) ("Allowing a defendant to use plea negotiations in mitigation would clearly discourage plea negotiations in capital cases as prosecutors would correctly fear that during the second stage proceedings, they would be arguing against themselves."); *Owens v. Guida*, 549 F.3d 399, 420-21 (6th Cir. 2008).

Prystash argues that plea negotiations were relevant to the future-dangerousness special issue because it showed that "the prosecutors had evaluated Prystash's personal, particularized situation, and had offered him not life, but 55 years imprisonment" under the assumption that "the State itself had determined that life may have been more appropriate than death" [Doc. # 52, p. 105]. Prystash's argument lacks merit. It relies on pure speculation about the State's motive in offering him a plea deal. A prosecutor may have many reasons for making a plea offer, some of which are wholly unrelated to an inmate's future dangerousness. For example, prosecutors may engage in plea negotiations to compensate for insufficient evidence unrelated to an inmate's danger to others, to preserve resources that are inadequate for prosecuting a capital crime, to save a victim's family the emotional trauma of trial, to reward an inmate for accepting responsibility, to avoid a potential acquittal, and because of other factors.

Prystash's argument that the prosecution made the 55-year imprisonment offer to him because he was no future threat is therefore unavailing. No federal law holds that the Constitution mandates the admission of rejected plea offers as relevant mitigating evidence at sentencing, and the state court was not unreasonable in declining to extend existing law in that manner. Prystash has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### C.    Absence of an Anti-Parties Special Issue (Claim Eight)

The jury instructions in the guilt/innocence phase allowed for Prystash's conviction under Texas's law of parties.  Consistent with Texas law, the trial court instructed the jury that Prystash could be convicted as a party "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both."  Clerk's Record at 403; *see* TEX. PENAL CODE ANN. §§ 7.01, 7.02.  The trial court instructed that Prystash could be responsible for any offense "committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  Mere presence alone will not constitute one a party to an offense."  Clerk's Record at 403.  Thus, the jury was informed it could convict Prystash of capital murder even if he did not pull the trigger himself, if it found he acted with intent to promote or assist the commission of the offense.

It is clear that allowing a conviction on party liability raises questions about individual sentencing.  The Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 801 (1982), held that the Eighth Amendment mandates that the punishment for participation in capital murder be tailored for "personal responsibility and moral guilt."   In 1991, Texas accommodated *Enmund* by using a separate special issue when the jury instructions allow for a defendant's conviction as a  party to a capital offense.  By statute, "in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code," the trial court instructs jurors to decide a separate special issue question that asks "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."  TEX. CRIM. PROC. CODE, art. 37.071 § 2(b)(2).  This instruction, often called an "anti-parties charge," "protects the defendant's constitutional rights by ensuring that a jury's punishment-phase deliberations are based solely upon the conduct of that defendant and not that of another party."  *Martinez v. State*, 899 S.W.2d 655, 657 (Tex. Crim. App. 1994) (1995); *see also McFarland v. State*, 928 S.W.2d 482, 516 (Tex. Crim. App. 1996).  "[T]he point of the anti-parties charge is to direct

the jury's focus to the conduct or mental state of the defendant as opposed to that of a co-defendant or accomplice." *Solomon*, 49 S.W.3d at 371.

Prystash argues that the trial court violated his constitutional rights by "accept[ing] an illegal and incomplete verdict which did not contain an answer to the 'anti-parties' special issue" [Doc. # 52, p. 105]. Before the punishment phase, Prystash filed a motion to determine the constitutionality of the "anti-parties" special issue question. Clerk's Record at 225-27. Prystash acknowledged that the trial court should deliver the statutory "anti-parties" charge, but argued that it failed to provide the jury with any guidance as to his deathworthiness. Clerk's Record at 225-27. After the trial court denied the motion, Tr. Vol. 4 at 243, Prystash requested that the trial court refrain from posing the anti-parties question. Trial counsel argued, "Judge the defendant's position is that we would waive [the anti-parties special issue], if at all possible. We consider [the anti-parties special issue] to be unconstitutional and on those grounds as previously stated to the Court, we don't want that question." Tr. Vol. 6 at 181. The trial court accordingly required the jury to decide two special issues: (1) whether Prystash would be a future societal danger and (2) whether sufficient circumstances mitigated against the imposition of a death sentence. Clerk's Record at 441-42. The trial court did not put the anti-parties special issue before the jury.

On direct appeal, Prystash argued that the trial court erred in failing to submit the anti-parties special issue. The TCCA found that an inmate cannot waive the statutory anti-parties special issue.[25] Nevertheless, the TCCA held that Prystash invited any error by requesting the omission of the anti-parties issue. *See State v. Moreno*, 294 S.W.3d 594, 601 (Tex. Crim. App. 2009) ("The invited-error doctrine estops a party from complaining that a trial judge erred when that party affirmatively sought the ruling."). The TCCA concluded: "we will not

---

[25]   The appellate court, in fact, reaffirmed that it could not allow "trial courts and criminal defendants to mutually consent to usurp the powers of the legislature. Thus, we must affirm the principle of absolute requirements and prohibitions which are not optional, waivable, or forfeitable, stating that neither a capital murder defendant nor a trial court may ignore the statutory scheme mandated . . . Article 37.071." *Prystash*, 3 S.W.3d at 530 (quotation omitted).

permit [Prystash] to complain of the trial court's deleting a jury charge as he requested." *Prystash*, 3 S.W.3d at 531.

On federal habeas review, Prystash argues that Texas law "does not permit waiver" of the anti-parties special issue and it "is, thus, a mandatory part of the jury charge" [Doc. # 52, pp. 106-07]. The TCCA agreed with this argument. Prystash, however, does not address the TCCA's further holding that he invited the error, and does not brief that doctrine's impact, procedurally or substantively, on federal habeas review. The Court turns to that question.

Federal law treats a Texas court's invocation of the invited error doctrine as a species of state procedural bar. *See Druery v. Thaler*, 647 F.3d 535, 545 (5th Cir. 2011); *Tucker v. Johnson*, 115 F.3d 276, 280-81 (5th Cir. 1997). Prystash may overcome this bar only by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law" or "that failure to consider the claims will result in a fundamental miscarriage of justice." *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Prystash has not shown that the state's invited error doctrine, which is a procedural rule, is not adequate to bar federal review. Nor has he shown that there is sufficient cause or that he has suffered prejudice as a result of the absence of the anti-parties special issue to excuse the procedural default. Finally, there is no showing that imposition of this procedural bar would result in a fundamental miscarriage of justice.

In addition, the Fifth Circuit has previously rejected constitutional claims based on the absence of an anti-parties special issue. The Fifth Circuit has held that "the [two standard] punishment special issues adequately allowed the jury to give mitigating effect to claimed 'nontriggerman' status, notwithstanding the absence of an 'anti-parties' instruction at sentencing." *Nichols v. Scott*, 69 F.3d 1255, 1267 (5th Cir. 1995).[26] Prystash does not

---

[26]    *See also Jacobs v. Scott*, 31 F.3d 1319, 1326 & n. 13 (5th Cir. 1994); *Harris v. Collins*, 990 F.2d 185, 189 (5th Cir. 1993); *Bridge v. Collins*, 963 F.2d 767, 770 (5th Cir. 1992); *Stewart v. Collins*, 978 F.2d 199, 201 (5th Cir.1992); *Drew v. Collins*, 964
(continued...)

discuss the constitutional adequacy of the other special issues to comply with *Enmund*'s requirement for individual sentencing. Importantly, the State's punishment phase argument drew the jury's attention to Prystash's own involvement in the crime, rather than that of his co-conspirators. For instance, the prosecutor argued:

> More importantly has there ever been a middle man more involved in the commission of a murder for hire than Joe Prystash. He didn't just find the shooter, he did everything. He did everything. The only thing he did not do was dream up the idea or pull the trigger.

Tr. Vol. 22 at 1317. The record does not suggest that the jury based its punishment-phase decision regarding Prystash on the personal responsibility or moral guilt of another or failed to consider his own conduct.[27] As such, Prystash thus fails to meet his burden of showing an entitlement to relief on this issue under traditional habeas law and AEDPA's demanding standards.

### D.    Texas's "12-10" Rule (Claim Nine)

Prystash argues that the trial court's punishment-phase instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988), by failing to adequately inform the jury on the effect of hold-out jurors. In *Mills*, the Supreme Court "held invalid capital sentencing schemes that require juries to disregard mitigating factors not found unanimously." *Beard v. Banks*, 542 U.S. 406, 408 (2004) (emphasis added); *see also Smith v. Spisak*, 558 U.S. 139, 148 (2010); *McKoy v. North Carolina*, 494 U.S. 433, 439-40 (1990). Because the Constitution mandates

---

[26]    (...continued)
F.2d 411, 421 (5th Cir. 1992).

[27]    Because the trial court instructed the jury in the guilt phase that Prystash could be responsible for any offense "committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense," Clerk's Record at 403, the jury was informed that it had to focus on whether Prystash personally acted with intent to solicit or aid in the offense before it could reach a guilty verdict. Thus, even in the absence of the second question, Prystash has not shown his conviction was not based on his own conduct.

that jurors be able to consider mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Mills* prohibits sentencing instructions that preclude jurors "from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384 (emphasis added).

Consistent with article 37.071, § 2, of the Texas Code of Criminal Procedure (commonly called the "12-10" Rule), the trial court told jurors that their votes for a death sentence must be unanimous, but that ten or more jurors could return an answer resulting in a life sentence. Clerk's Record at 437-38. Prystash contends that, by not informing the jury of the effect of a single dissenting vote or of a single hold-out juror, the instructions predisposed the jurors to impose a death sentence, thus violating the Fifth, Eighth, and Fourteenth Amendments. Prystash argues that the 12-10 Rule instruction gave jurors the mistaken impression that they did not have an individual ability to prevent a death sentence, thus precluding them from considering mitigating evidence.

The TCCA denied this claim on direct appeal court as it has "consistently upheld as constitutional" Texas's use of the 12-10 Rule. *Prystash*, 3 S.W.3d at 536. The Fifth Circuit has held that Texas's 12-10 Rule instruction "is wholly dissimilar to that involved in *Mills*," *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996), because "all jurors can take into account any mitigating circumstance." *Jacobs*, 31 F.3d at 1329. Unlike in *Mills*, "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously." *Spisak*, 558 U.S. at 148. On that basis, the Fifth Circuit has repeatedly denied 12-10 Rule claims. *See Allen v. Stephens*, 805 F.3d 617, 632 (5th Cir. 2015); *Holiday v. Stephens*, 587 F. App'x 767, 789 (5th Cir. 2014); *Reed v. Stephens,* 739 F.3d 753, 779 (5th Cir. 2014); *Parr v. Thaler,* 481 F. App'x 872, 878 (5th Cir. 2012); *Druery v. Thaler,* 647 F.3d 535, 542–43 (5th Cir. 2011); *Greer v. Thaler,* 380 F. App'x 373, 389 (5th Cir. 2010). Prystash's challenge to the 12-10 Rule thus fails in light of the AEDPA standards of review.

The Fifth Circuit also has held that any extension of *Mills* to Texas's penalty-phase instructions would violate *Teague v. Lane*'s prohibition on habeas courts from creating new

constitutional law. *See Druery*, 647 F.3d at 542–43 (5th Cir. 2011). For these various procedural and precedential reasons, this Court concludes that Prystash has not shown entitlement to habeas relief based on the trial court's 12-10 Rule instruction to the jury.[28]

### E.     Burden of Proof on Aggravating Factors (Claim Ten)

Prystash argues that the Eighth Amendment requires the State to prove beyond a reasonable doubt any aggravating elements in the punishment-phase, including those that may be related to the defense's mitigating evidence. The trial court, following Texas law, required jurors to answer the mitigation special issue[29] after "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant . . . ." Clerk's Record at 442.[30]  Prystash argues that Texas has interpreted this special issue to encompass an "expansive review" that allows jurors to review all trial evidence, "not just evidence a juror might consider to be mitigating." *Scheanette v. State*, 144 S.W.3d 503, 508 (Tex. Crim. App. 2004). In other words, he posits that "aggravating circumstances can be considered in connection with the mitigation special issue" because they "may be relevant to determine whether a particular mitigating circumstance or set of circumstances is sufficient to warrant a life sentence." *Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999). Given that

---

[28]   While relief on the 12-10 Rule instruction is foreclosed, this Court has qualms about the phrasing of the instruction, and urges that the state courts clarify the law for the jury in a more comprehensible manner.

[29]   In Texas, before a defendant receives the death penalty, the jury must answer the following: (1) whether the defendant would be a future societal danger and (2) whether sufficient circumstances mitigated against the imposition of a death sentence.

[30]   Prystash filed a pre-trial motion seeking to question the prospective jurors as to whether they would require the prosecution to prove, beyond a reasonable doubt, that no circumstances mitigated against a death sentence. Clerk's Record at 150-52. The defense also asked that the trial court instruct the jurors to place a burden of proof on the prosecution with respect to the consideration of mitigating evidence. Clerk's Record at 418-20. The trial court denied both motions.

"this special issue is a conduit for aggravating factors (victim impact evidence, for example) as well as mitigating factors," Prystash contends that Texas's capital sentencing statute is constitutionally defective because it "places no burden of proof on the State with respect to those factors . . ." [Doc. # 52, pp. 119, 121 (emphasis in original)]. Prystash also complains that the absence of allocation of the burden of proof places the jury's review of mitigating evidence beyond appellate review.

Prystash bases this claim on *Walton v. Arizona*, 497 U.S. 639, 650 (1990), which he reads to hold that "the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase" [Doc. # 52, p. 118]. A capital sentencing process must contain two elements: "the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). "To render a defendant eligible for the death penalty in a homicide case, [the Supreme Court has] indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* at 971-72. In Texas, jurors make the eligibility decision in the guilt/innocence phase by finding that the defendant killed under one of several specifically defined circumstances. *See* TEX. PENAL CODE § 19.03; *Lowenfield v. Phelps*, 484 U.S. 231, 246-47 (1988); *Jurek v. Texas*, 428 U.S. 262, 270-71 (1976); *Adams v. Thaler*, 421 F. App'x 322, 337 (5th Cir. 2011). Texas is "required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death." *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006). The United States Supreme Court has held that "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Tuilaepa*, 512 U.S. at 980 (internal quotation marks omitted). In fact, the jury has "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty." *Id.* at 979.

The TCCA observed on direct appeal that "the concerns of *Walton* are not implicated"

because "the jury does not decide the mitigation special issue until after the State has proven the elements of capital murder and that the defendant is a future danger . . . ." *Prystash v. State*, 3 S.W.3d 522, 535 (Tex. Crim. App. 1999).   The Fifth Circuit has similarly commented that, by the time a jury considers the mitigation special issue, "it ha[s] already found the existence of such aggravating circumstances, and ha[s] already determined that [the defendant is] eligible to receive a death sentence." *Allen v. Stephens*, 805 F.3d 617, 628 (5th Cir. 2015).   The TCCA properly concluded that "[t]he lack of a burden of proof in the mitigation special issue does not lessen the State's burden to prove the elements of capital murder, which include the statutory aggravators." *Prystash*, 3 S.W.3d at 535.   Once the State has proven Prystash's guilt and his future dangerousness, the law allows a jury to find that he could be sentenced to death based on consideration of the entire record.

In context the mitigation question and in compliance with constitutional law, however, Texas's sentencing scheme gave Prystash another opportunity to show that death should not be imposed, even though the State had already met its burden of proof.   The mitigation special issue is, in this sense, analogous to an affirmative defense.   The mitigation special issue does not address a factor necessary to increase the maximum sentence; rather, it addresses factors that allow the jury to impose a sentence less than the statutory maximum. The Fifth Circuit has held that "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."   *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005).   Thus, the TCCA's rejection of this claim was not contrary to, or an unreasonable application of, federal law.   *See* 28 U.S.C. § 2254(d)(1).

### F.    Jury Consideration of Unadjudicated Prior Offenses (Claim Eleven)

In summary fashion, Prystash argues that the trial court denied his due process rights by refusing to limit the jury's punishment-phase consideration of unadjudicated offenses, prior bad acts, or his guilt for Farah Fratta's murder.[31]   Texas law allows the parties in the

---

[31]    Before trial, the prosecution informed the defense that it wished to present evidence in the punishment phase showing that Prystash committed prior crimes and several
(continued...)

---

[31]        (...continued)
unadjudicated offenses.  Clerk's Record at 24-25.  Specifically, the prosecution
provided the defense with the following non-exhaustive list of fourteen offenses and
bad acts Prystash had allegedly committed in the past:

1.  Burglary of structure and Grand Larceny (6 Counts) as reflected
in cause no. 76-7623 and Burglary of structure reflected in cause
no 76-8389-B, 3/14/77, 11th Judicial Circuit of Fla., Dade
Country.

2.  Aggravated Robbery, offense unadjudicated, Complainant, John
Bigelow, approximately October 1983, Montgomery Co., Tx.

3.  Speeding and failure to Maintain Proof of Insurance, December
2, 1983, Lee Rd., Harris County, Tx. (DPS No. s 967721).

4.  Unauthorized use of a motor vehicle, reflected in cause
no.404370, 339th District Court, May 31, 1984, 4 years
probation.  Probation revoked July 21, 1988, reformed to 3 years
TDC.

5.  Unlawful carrying of a weapon, May 17, 1988, cause no.
8818080.

6.  Theft, May 17, 1988, cause no. 8818081

7.  Burglary of a habitation, 19610 Forest Fern, Humble, June, 28,
1994, unadjudicated.

8.  Attempted Murder/Aggravated Assault, unadjudicated, Conroe,
Texas, June 8, 1991 Mark Allen Cooper, Jr. complainant.

9.  General Discharge for Disciplinary reasons, U.S. Marines,
approximately 1976.

10.  Juvenile probation for burglary, Dade County, Fla. when the
defendant was 12 years of age.

11.  Juvenile probtion for burglary, Date County, Fla. when the
defendant was 14 years of age.

12.  Statement to Podhorsky that the defendant was hired to assault
an individual who gave Robert Fratta a bad check. Exact date
unknown, occurred in Harris County, Texas.

13.  Selling steroids to John Ruiz at the Roman Health Spa in the
1980s.

14.  Possession of Steroids in Harris County, Texas in the year
1985-86, along with steroid use repeatedly since 1983.

Clerk's Record at 24-25.  The State did not introduce in evidence all these extraneous
(continued...)

punishment phase of a capital-murder trial to present any evidence "relevant to sentence," including proof of unadjudicated, extraneous offenses. *See* TEX. CODE CRIM. PRO. art. 37.071 § 2(a); *Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994). "The focus of the Texas sentencing procedure is to have all the relevant evidence before the jury when answering the special issues which determine whether the death penalty will be imposed." *Williams v. Lynaugh*, 814 F.2d 205, 207 (5th Cir. 1987).

The Fifth Circuit has consistently held that Texas's use of unadjudicated, extraneous offenses in the penalty phase does not offend the Constitution. *See, e.g. Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996); *Jackson v. Johnson*, 194 F.3d 641, 655-56 (5th Cir. 1999). In fact, the Fifth Circuit has held that "[e]vidence of . . . unadjudicated crimes is clearly relevant to the jury's task of determining whether there is a probability that [the defendant] would continue to commit acts of violence as required by [the future dangerousness special issue]." *Williams*, 814 F.2d at 208. The Fifth Circuit has held that the Constitution does not require that unadjudicated extraneous offenses be proved beyond a reasonable doubt. *See Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir.1998).

The Fifth Circuit also has held that the Constitution does not require any limiting instruction for the consideration of unadjudicated offenses. *See Beazley v. Johnson*, 242 F.3d 248, 262 (5th Cir. 2001); *Barrientes*, 221 F.3d at 781-82. Finally, because the Constitution does not prohibit introduction of those offenses in the penalty phase, the Fifth Circuit has held that relief could only be granted on similar claims by creating a new rule of constitutional law in violation of *Teague v. Lane*, 489 U.S. 288 (1989). *See Harris*, 81 F.3d

---

[31]   (...continued)
offenses or bad acts. For instance, the jury did not learn about Prystash's juvenile record or his involvement with steroids. The jury learned that Prystash had beaten his brother-in-law but that the subsequent charge had been dismissed. The defense filed a motion to exclude any evidence of unadjudicated and extraneous offenses in the punishment phase. Clerk's Record at 111-13. The trial court denied that motion. The defense also proposed jury instructions that would limit the jury's consideration of the unadjudicated and extraneous offenses, but this request was denied. Clerk's Record at 414-17.

at 541.  This claim is both lacks merit and is barred by *Teague*.

### G.     Trial Court Instructions on the Mitigation Special Issue (Claim Twelve)

In his last federal claim, Prystash complains that the trial court denied his Eighth Amendment rights by providing the jurors a definition of mitigating evidence that restricted their consideration of his punishment-phase evidence.  The trial court used the commonly used Texas instruction: "[Y]ou shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that mitigates against the imposition of the death penalty." Clerk's Record at 438.  Texas law requires the trial court to describe mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PRO. art. 37.071 § 2(g).  Even though the instruction given by the trial court informs jurors to consider broad factors such as a defendant's background and character, Prystash argues that the instructions confined the jury to considering only that relating to his "personal culpability" by emphasizing the term "moral blameworthiness." Clerk's Record at 435.

Prystash raised this claim on direct appeal.  The TCCA reviewed the instructions given in this case, and those proposed by the defense, in relation to the evidence presented at trial.  The TCCA relied on its precedent to hold that the charge describing the mitigation special issue provided a broad review that complied with constitutional requirements.  Also, the TCCA found that Prystash did "not complain of any evidence to which the jury could not give effect; therefore, even if the statute is deficient in the way that he suggests, he did not suffer the deficiency."  *Prystash*, 3 S.W.3d at 535 (quotation omitted).  Prystash must show that the state court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

The Supreme Court has clearly established the principle that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual,

notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul–Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also Boyde v. California*, 494 U.S. 370, 377-78 (1990) (stating that the "Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence"). The Fifth Circuit has considered similar arguments relating to the term "moral blameworthiness" and found that Texas's language "does not unconstitutionally preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Beazley*, 242 F.3d at 260; *see also Blue v. Thaler*, 665 F.3d 647, 665-66 (5th Cir. 2011).  In fact, the Fifth Circuit has emphasized that "'[v]irtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability.'" *Beazley*, 242 F.3d at 260; *see also Blue*, 665 F.3d at 666; *Jackson v. Dretke*, 181 F. App'x 400, 413 (5th Cir. 2006).  On that basis, the Fifth Circuit has repeatedly found that Texas's statutory definition for mitigating evidence broadly passes constitutional muster.  *See Blue*, 665 F.3d at 666; *Robles v. Thaler*, 344 F. App'x 60, 63-64 (5th Cir. 2009); *Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007); *Jackson v. Dretke*, 181 F. App'x 400, 413-14 (5th Cir. 2006); *O'Brien v. Dretke*, 156 F. App'x 724, 735-36 (5th Cir. 2005); *Beazley*, 242 F.3d at 260.  Accordingly, Prystash has not shown that the state court's decision regarding his challenge to the trial court's mitigation instruction was contrary to or an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d)(1).  This claim is rejected.

## VII.   CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).  Prystash has not sought a Certificate of Appealability ("COA"), though this Court may consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

After careful review of the pleadings and the applicable law, the Court concludes that reasonable jurists would not find that this Court was incorrect in its procedural ruling or that the Court's assessment of the constitutional claims was debatable or wrong. Because Prystash does not otherwise allege facts showing that his claims could be resolved in a different manner, this Court will not certify for appeal any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## VIII.  <u>CONCLUSION</u>

For the reasons discussed above, Prystash has not shown an entitlement to federal habeas relief. It is therefore

**ORDERED** that Respondent William Stephen's Motion for Summary Judgment [Doc. # 57] is **GRANTED**. It is further

**ORDERED** that Joseph Andrew Prystash's Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE**. It is further

**ORDERED** that no certificate of appealability will issue in this case.

**SIGNED** this **17th** day of **March, 2016**, at Houston, Texas.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE