# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-70014

United States Court of Appeals
Fifth Circuit
**FILED**
April 26, 2017
Lyle W. Cayce
Clerk

JOSEPH ANDREW PRYSTASH,

    Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

    Respondent - Appellee

United States District Court
Southern District of Texas
FILED
APR 2 6 2017
David J. Bradley, Clerk of Court

4:05- CV- 1546

Appeal from the United States District Court
for the Southern District of Texas

---

Before GRAVES, HIGGINSON, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

    Two decades after being sentenced to death for being the middleman in a murder-for-hire, Joseph Andrew Prystash seeks a certificate of appealability to appeal the district court's denial of his petition for a writ of habeas corpus. He asks us to certify the following questions: (1) whether there was cause for the procedural default of his *Batson* claim; (2) whether the State's withholding of evidence about the involuntariness of a codefendant's confession established a *Brady* violation; (3) whether the trial court violated his right to present mitigation evidence at sentencing when it limited expert testimony; (4) whether the introduction of evidence of unadjudicated offenses at sentencing

violated the Eighth Amendment; and (5) whether the state court's application of the invited error doctrine was not an adequate procedural bar against his claim that he was unconstitutionally sentenced to death without an anti-parties jury instruction.

## I.

### A.

In November 1994, Farah Fratta was shot and killed exiting a vehicle in her garage. Suspicion immediately focused on her husband, Robert Fratta, who was a local police officer. The Frattas had been involved in a contentious divorce, with a child custody hearing set for the end of that month. The night of the murder, Robert Fratta was at church with his children. Phone records and witness testimony showed that, while at church that evening, he made several calls to a mobile phone number belonging to Mary Gipp. Gipp was the girlfriend of petitioner Joseph Prystash.

Detective George Roberts later interviewed Gipp. She recounted Prystash saying he had been hired by Robert to kill Farah and that he had then made a deal with Howard Guidry to shoot Farah. By this time, Guidry was in jail on another charge. Roberts and another detective, Jim Hoffman, then questioned Guidry about the murder. *See Guidry v. Dretke*, 429 F.3d 154, 155 (5th Cir. 2005). When Guidry requested an attorney, they ceased questioning him, but later returned and lied to him. They said that his attorney had given permission for him to speak with them. *Id.* In response to this falsehood, Guidry confessed to shooting Farah and described how he had been hired by Robert, through Prystash, to commit the crime. *Id.* In Guidry's federal habeas case, we held that the police obtained his confession unlawfully and vacated his conviction. *Id.* at 157.

Using a warrant acquired with an affidavit by Sergeant Danny Billingsley describing Gipp's statements and Guidry's confession, the police

2

arrested Prystash. They then questioned him about the killing. After Prystash disclaimed all knowledge and responsibility, the officers released him from custody.

Billingsley drove Prystash back to his car. On the way, Prystash confessed that he had received a gun and instructions from Robert, solicited Guidry to shoot Farah, and drove Guidry to and from Farah's home. Billingsley told Prystash to come to the police station the next day so he could give a formal statement, and when he did not appear, the police arrested him again. While in custody, he signed a written statement admitting to participating in Farah's murder.

### B.

Prystash's trial began in the summer of 1996. During voir dire, the State used its peremptory strikes to remove all five of the black venire members who were questioned. Prystash's counsel objected that "every black panelist was struck" from the venire. Counsel said, "especially we are calling to the Court's attention of the strike of juror Ms. Merchant . . . ." That resulted in a *Batson* inquiry for the Merchant strike during which the court asked the prosecutor to provide a race neutral justification for that strike. The court credited the prosecutor's explanation. Defense counsel did not ask for that process for the other four struck black jurors. When the court asked defense counsel if there was anything else that needed to be done for the record, the answer was, "I don't think so."

During the trial, the prosecution introduced Prystash's written confession. In addition, Billingsley testified to the incriminating statements made by Prystash while he was driving him home.

Gipp also testified. She described discussions about killing Farah between Prystash and Robert Fratta in the months leading up to the murder. She also stated that Robert gave Prystash a gun. Gipp explained that Prystash

3

had told her about how the killing would take place, about hiring Guidry, and what rewards he and Guidry would receive. Gipp further incriminated Prystash by testifying that he and Guidry left home on the night of the killing dressed in black. She said that Prystash returned a few hours later and emptied the cartridges from a gun, telling her that Farah had been killed and describing how the men had carried out the shooting. According to Gipp, Prystash then left home again to meet Fratta.

In addition to Prystash's statements and Gipp's testimony, the jury also heard Guidry's confession. While cross-examining Detective Roberts about Prystash's arrest, Prystash's trial counsel introduced the warrant for his arrest into evidence in order to show that the detective had not complied with its order to bring him before the issuing judge but instead had held and questioned him irregularly[1] before releasing him with Billingsley. Later, while questioning Billingsley about the circumstances of the arrest, the State asked him to read from the affidavit supporting the warrant, which recounted at length Guidry's confession implicating Prystash.

The jury convicted Prystash of capital murder. During the sentencing phase that followed, the State introduced evidence of Prystash's extensive criminal record, including an arrest for attempted murder. It also offered evidence of his bad character. Two of his ex-wives testified that he was remorseless, selfish, angry, manipulative, and lacked compunctions of conscience. In response, the defense offered the testimony of family members who described Prystash's harsh upbringing, including his mother's alcoholism. The defense also called two volunteer religious leaders who worked with

---

[1] Trial counsel at one point insinuated that the officers never read Prystash his *Miranda* rights.

Prystash while he was in Harris County jail. They agreed that Prystash was not a danger to others and spoke of his honesty and piety.

Lastly, the defense called psychologist Walter Quijano. Quijano testified that Prystash would not be a continuing threat to guards or inmates if sent to prison. The defense wanted Quijano to testify about how Prystash would be classified and grouped with other inmates while incarcerated, but the trial court prohibited the defense from eliciting that testimony before the jury because it found it was speculative.

The jury sentenced Prystash to death.

### C.

Prystash appealed to the Texas Court of Criminal Appeals. Among other things, he argued that the trial court had erred by not submitting to the jury a statutory special issue at sentencing on the responsibility of one found guilty of capital murder as a party to the crime rather than as the shooter. *See Prystash v. State*, 3 S.W.3d 522, 530–32 (Tex. Crim. App. 1999). At trial Prystash had asked that the instruction not be given, but the Court of Criminal Appeals had previously held that the doctrine of invited error, which generally holds that a party cannot complain of trial errors it induced, could not excuse omission of a similar special issue instruction. *Id.* at 529–32 (discussing *Powell v. State*, 897 S.W.2d 307 (Tex. Crim. App. 1994)). In Prystash's case, the court overruled itself, rejecting the challenge to the omission using the invited error doctrine. *Id.* at 532.

After losing his direct appeal, Prystash sought postconviction relief in the Texas courts. After that proved unsuccessful, he filed his federal petition. The district court recognized that some of his claims had not been raised in state court. It thus stayed the federal proceedings so that Prystash could remedy this problem with a new state habeas petition. Because this was a successive petition, the Court of Criminal Appeals only allowed one of

5

No. 16-70014

Prystash's claims, corresponding to his present *Brady* claim, to proceed. *Ex parte Prystash*, 2008 WL 5245551, at *1 (Tex. Crim. App. Dec. 17, 2008). That claim, which alleged that the State suppressed evidence about the unlawfulness of Guidry's confession, was rejected on the merits as discussed further below.

Prystash then returned to federal court, where he unsuccessfully prosecuted his amended petition. The district court analyzed each of Prystash's twelve claims in detail. It refused to grant a certificate of appealability on any issues. Prystash now asks us to grant one, but has narrowed that request to the five questions listed at the outset.

## II.

Under the Antiterrorism and Effective Death Penalty Act, a certificate of appealability (COA) must issue before a habeas petitioner can appeal the district court's refusal to grant the writ. 28 U.S.C. § 2253(c)(1)(A). We will issue a COA upon a "substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). Prystash will meet this standard if he shows that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (internal quotations and citation omitted); *see also Buck v. Davis*, 137 S. Ct. 759, 773 (2017). If the district court found that there was a procedural obstacle to habeas relief, we will likewise grant a COA if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) (internal quotations omitted). "Where the petitioner faces the death penalty, 'any doubts as to whether a COA should issue must be

6

No. 16-70014

resolved' in the petitioner's favor." *Allen v. Stephens*, 805 F.3d 617, 625 (5th Cir. 2015) (quoting *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004)).

In assessing whether the district court's rejection of Prystash's claims is debatable, we consider them under the deference AEDPA mandates federal courts show their state peers. A federal court should not grant habeas relief unless the petitioner has exhausted the remedies available in state court for reviewing the claim. 28 U.S.C. § 2254(b). When the state court has considered and rejected the merits of the claim, a federal court can only grant relief when the state judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A federal court must assume the state court's determination of the facts is correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### A.

Prystash argued to the district court that his conviction should be vacated because the prosecution discriminated against black prospective jurors. *See Batson v. Kentucky*, 476 U.S. 79 (1986). Although Prystash is not black, he may challenge the exclusion of these jurors. *Powers v. Ohio*, 499 U.S. 400, 406–11 (1991). The district court held that this claim was procedurally barred because Prystash had not raised it in state court until his successive state petition, at which time the Texas Court of Criminal Appeals rejected it for not being raised earlier. *See Maples v. Thomas*, 565 U.S. 266, 280 (2012). Prystash acknowledges that in order to obtain relief on this ground he must show cause to excuse the procedural default in state court. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

7

No. 16-70014

In the district court, Prystash tried using *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), to excuse the default. In *Martinez*, the petitioner's claim of ineffective assistance of counsel at trial was procedurally barred based on the rejection of that claim in his second state habeas petition for having failed to raise the claim in his first state habeas petition. 566 U.S. at 7–8. The Supreme Court held that Martinez could excuse this default by showing that his initial state habeas counsel had been ineffective, because Arizona law does not allow a claim of ineffective assistance of counsel to be brought until the postconviction stage (given the need for factual development not often available on direct appeal). 566 U.S. at 17. In *Trevino*, the Supreme Court extended *Martinez* to habeas petitioners in Texas where the law does not bar bringing ineffective assistance claims on direct appeal, but in practice, meaningful review of such claims is confined to collateral review. *Trevino*, 133 S. Ct. at 1921.

*Martinez* thus created an exception to the general rule, which provides that the ineffectiveness of a petitioner's habeas attorney is not cause to excuse a procedural default because there is no constitutional right to representation at that stage. *Coleman*, 501 U.S. at 752–53. As the district court here noted, however, the Supreme Court insisted this was a "'narrow exception' that applies only with respect to 'cause for a prisoner's procedural default of a claim of *ineffective assistance at trial*.'"[2] *Prystash v. Stephens*, 2016 WL 1069680, at

---

[2] We note that the Supreme Court is currently considering whether *Martinez/Trevino* applies to a petitioner citing ineffective assistance of habeas counsel as cause for default of a claim of ineffective assistance of counsel on direct appeal (as opposed to the trial-based claim at issue in *Martinez* and *Trevino*). *See Davila v. Davis*, 137 S. Ct. 810 (2017). But even if the Supreme Court reverses our ruling in *Davila*, that would not help Prystash with his COA application. Although Prystash did include ineffective assistance of both trial and appellate counsel among the dozen claims raised in the district court (the court rejected them as both without merit and procedurally defaulted), he does not seek a COA related to any freestanding claim of ineffective assistance of counsel.

8

No. 16-70014

*24 (S.D. Tex. Mar. 17, 2016) (quoting *Martinez*, 132 S. Ct. at 1315). *Martinez/Trevino* is so limited because of the nature of ineffective assistance claims, which some states bar from being asserted on direct appeal and other states are reluctant to allow on direct appeal. In contrast, most other claims of trial error (certainly *Batson* violations among them) can be asserted on direct appeal,[3] and it has long been the case that when such claims are procedurally defaulted because not asserted on direct appeal, the ineffectiveness of appellate counsel may excuse that default. *See, e.g., United States v. Guerra*, 94 F.3d 989, 993–94 (5th Cir. 1996); *United States v. Price*, 959 F.2d 1297, 1301 (5th Cir. 1992). There is no need for *Martinez/Trevino* to come into play for such claims that can be brought on direct appeal. Because the reasoning underlying *Martinez/Trevino* does not extend to claims that can generally be brought on direct appeal and Prystash cites no caselaw at any level adopting such an extension, the district court's rejection of *Martinez/Trevino* as cause for the defaulted *Batson* claim is not debatable.[4] *Cf. Hunton v. Sinclair*, 732 F.3d 1124, 1127 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1771 (2014) (refusing to apply *Martinez* and allow ineffective assistance of state habeas counsel to excuse default of a *Brady* claim).[5]

---

[3] *See, e.g., Blackman v. State*, 414 S.W.3d 757 (Tex. Crim. App. 2013); *Degar v. State*, 482 S.W.3d 588 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

[4] The district court also concluded that even if *Martinez/Trevino* did apply, Prystash did not make sufficient allegations to show that habeas counsel was ineffective in failing to raise *Batson*. Prystash now argues that his initial state habeas counsel was ineffective for failing to obtain jury questionnaires. But this claim of ineffectiveness was not presented to the district court.

[5] There is a dissent in *Hunton*, which might show that its holding regarding *Brady* is debatable. *See* 732 F.3d at 1127 (Fletcher, J., dissenting). But because *Brady* claims by their nature typically apply only when evidence is obtained after trial, they are more commonly first raised on collateral attack, given the need for factfinding, than are *Batson* claims. It is also noteworthy that in the four years since the *Hunton* dissent, we are aware of no cases extending *Martinez/Trevino* to cases in which the underlying claim is not one based on *Strickland v. Washington*, 466 U.S. 668 (1984) (addressing right to effective assistance of counsel).

9

No. 16-70014

For the first time in his COA application, Prystash argues that his *Batson* claim should be excused because he could not have obtained the juror questionnaires that were necessary to prove up his claim during either his direct appeal or state habeas (he ultimately obtained them after asking the federal district court to order their disclosure). But he did not identify this potential ground for cause in the district court. In deciding whether to issue a COA, we are limited to considering only the debatability of the district court's reasoning and the issues on which the petitioner sought the COA below. *Johnson v. Quarterman*, 483 F.3d 278, 288 (5th Cir. 2007). And this argument speculating about what was possible in state court is one in which the factfinding function of the district court would have been particularly helpful. How are we to determine at this stage that a request for the records at trial, on direct appeal, or during state postconviction proceedings would have been futile? All we know is that when Prystash requested a court order from the federal habeas court, the state court produced the documents that remained (the jury questionnaires; jury cards containing information about the racial makeup of the venire had been destroyed). Due again to the absence of a record that could have been developed if this issue had been raised in district court, we do not know when the jury cards were destroyed and hence whether Prystash could have obtained them at the time of his direct appeal or initial state habeas petition.

The grounds Prystash cites for cause were either (1) not raised in the district court or (2) seek an extension of *Martinez/Trevino* beyond the realm of ineffective assistance claims for which there is no supporting authority. We will not issue a COA to review the procedural default ruling.

**B.**

Prystash argues that he was denied due process by the State's failure to disclose that Guidry's confession, which Billingsley recounted to the jury, was

10

No. 16-70014

involuntary. *See Brady v. Maryland*, 373 U.S. 83 (1963). To succeed on a *Brady* claim, one must show that the prosecution suppressed evidence, that was favorable to the defense, material to either guilt or punishment, and was not discoverable using due diligence. *Graves v. Cockrell*, 351 F.3d 143, 153–54 (5th Cir. 2003).

This was the one claim that the Texas Court of Criminal Appeals allowed to proceed in Prystash's second attempt at obtaining habeas relief in state court. But it later adopted the finding of the Texas district court that the information about Guidry's confession was not material due to other overwhelming evidence of his guilt. The district court gave deference to the Texas court's application of governing federal law in this respect. *See Dickson v. Quarterman*, 462 F.3d 470, 477–78 (5th Cir. 2006) (court conducting AEDPA review decides whether state court's materiality finding was unreasonable application of federal law).

In his request for a COA, Prystash contends that the district court applied the wrong standard of materiality to his *Brady* claim. He asserts that the court incorrectly required that he show it is "more likely than not" that the result of the proceeding would have been different, rather than just a reasonable likelihood that the new evidence could have affected the judgment of the jury. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995). He is correct that "reasonable probability," not "more likely than not," is the burden a defendant raising a *Brady* claim must meet. *Kyles*, 514 U.S. at 434.

But the district court did not apply the higher burden. The relevant section of its opinion reads as follows:

> The state court's findings emphasized that information about Guidry's confession would not have made any difference in Prystash's trial. Under *Brady*, "[e]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

11

> proceeding would have been different." *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). "[T]he materiality test is not a test of the sufficiency of the evidence. . . . Rather, a *Brady* violation is established by showing 'that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Graves*, 442 F.3d at 340 (quoting *Kyles*, 514 U.S. at 435); *see also United States v. Bagley*, 473 U.S. 667, 682 (1985); *Duncan v. Cain*, 278 F.3d 537, 539–40 (5th Cir. 2002).

*Prystash*, 2016 WL 1069680, at *17. The paragraph shows that the district court did not hold Prystash to a higher standard, but instead assessed the state court's rejection of his *Brady* claim under the correct "reasonable probability" standard.[6]

In doing so, the district court relied on overwhelming evidence of Prystash's guilt apart from Guidry's confession. Most damning was Prystash's confession. Also powerful was the detailed testimony of his girlfriend, Gipp, relaying statements Prystash made and actions he took connecting him to the murder. Prystash's words, either in the form of his confession or what he told Gipp, did not factor into the analysis when we found the *Brady* violations were material in Guidry's case. The jury that convicted Guidry did not hear

---

[6] Prystash also seems to argue that there is a difference between showing (1) a reasonable probability that the outcome would have been different, and (2) a "reasonable likelihood" that that the new evidence "could have 'affected the judgment of the jury.'" *Wearry*, 136 S. Ct. at 1006 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). *Wearry* invoked only the latter standard. But *Kyles* uses both formulations, employing the "undermining confidence in the verdict" language to flesh out what it means to show by a "reasonable probability that the outcome would have been different." 514 U.S. at 422, 433 n.7, 434–35. And we have long used both formulations interchangeably. *E.g.*, *Banks v. Thaler*, 583 F.3d 295, 310–11 (5th Cir. 2009). To the extent Prystash argues that *Wearry* established a new, more lenient standard for *Brady* defendants, we see no support for that proposition. *Wearry* was a summary reversal by the Supreme Court decided without oral argument. 136 S. Ct. at 1008 (Alito, J., dissenting). That procedural posture is not one in which we would expect the Supreme Court to change the standard for an important issue like *Brady* materiality. And Prystash points us to no case reading *Wearry* as changing the standard. In any event, if the standards are indeed different as Prystash suggests, the district court's substantive ruling is not debatable considering just the "could have affected the jury" standard he urges.

Prystash's confession to law enforcement, and his words that Gipp recounted were inadmissible hearsay as to Guidry (they are not hearsay as to Prystash because they are statements by the party opponent). *See Guidry v. Dretke*, 397 F.3d 306, 329–30 (5th Cir. 2005). Given the inculpatory force of this evidence against Prystash, it is not surprising that at his trial the Guidry confession was only briefly mentioned and not later emphasized by prosecutors. The district court's deference to the state court's conclusion—that disclosure of the unlawful means by which Guidry's confession was obtained does not undermine confidence in the verdict—is not debatable.

Also relying on the State's failure to disclose evidence about the Guidry confession, Prystash argues that his due process rights were violated because the testimony about that confession was false. *See Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). This testimony occurred when Billingsley testified that Guidry's confession was voluntary, when in reality it was unconstitutionally obtained due to officer deception. As with the traditional *Brady* claim, the district court deferred to the state court's determination that the testimony concerning Guidry's confession was "sparse" and that the confession itself was cumulative of the extensive incriminating statements Prystash made both to law enforcement and his girlfriend. In light of that substantial amount of independent incriminating evidence and the deference owed to the state court, jurists of reason would not disagree with the district court's conclusion.

Perhaps recognizing that the heart of the case against him was his confession and Gipp's testimony, Prystash changes the focus of his *Brady* argument in his COA application. In addition to the arguments he made in state court and federal district court that the unlawfulness of the Guidry confession was exculpatory under *Brady* and rendered testimony false under *Napue* and *Giglio*, he now contends that the improper police conduct could have

13

been used to impeach the value of his own confession. *See Giglio*, 405 U.S. at 153–54 (discussing impeachment value of evidence not turned over to the defense). He made only passing references to this in his district court briefing so the court did not address it. But even if Prystash did sufficiently raise this variation of his *Brady* claim in the district court and exhaust it in state court, the impeachment value of Guidry's wrongful confession was not substantial for Prystash's confession. The officers who took Prystash's written confession (Detectives Davis and Valerio) were not involved in obtaining Guidry's confession. The officer who received Prystash's oral confession (Billingsley) was not the one who lied to Guidry. And again, Gipp heavily corroborated Prystash's confession, and officer misconduct would not impeach her testimony.

Prystash has not met the COA standard for any of his claims relating to the failure to disclose the circumstances surrounding Guidry's confession.

### C.

Prystash next asserts that he was denied his right to present all mitigating evidence bearing on his character and personal history when the State refused to allow Quijano to testify about how Prystash would likely be classified and segregated from other inmates in the Texas prison system. *See Barefoot v. Estelle*, 463 U.S. 880 (1983); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Prystash, however, overstates the force of these cases. They "did not federalize the law of evidence." *Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983). In this case, the trial court excluded Quijano's testimony on this point because it ruled it was speculative. *See Watts v. Quarterman*, 244 F. App'x 572, 576 (5th Cir. 2007) (per curiam). The evidentiary rulings of a state court will only be overridden when there is error "so extreme that it constituted denial of fundamental fairness." *Evans v. Thigpen*, 809 F.2d 239, 242 (5th Cir. 1983) (quoting *Mattheson v. King*, 751 F.2d 1432, 1445 (5th Cir. 1985)). The

14

No. 16-70014

district court found that Prystash had not made this showing, and he does not argue to the contrary to this court, instead focusing his arguments on the allegation that the State has been allowed to introduce similar evidence in other capital cases and emphasizing a capital defendant's right to present mitigating evidence without acknowledging the limitations on that right that honor state rules of evidence. Jurists of reason would not disagree that the district court decided this issue correctly.

### D.

Prystash also maintains that it was error for the trial court to allow the prosecution to introduce evidence of past unadjudicated offenses, such as his previous arrest for attempted murder, when the jury was deciding whether he should be sentenced to death. He argues that doing so violates the Eighth Amendment because it "introduces unreliability into death penalty sentencing, permits undue prejudice, and lowers procedural safeguards for defendants." This claim is nonetheless foreclosed by our precedent, so reasonable jurists could not disagree that the district court correctly decided it against Prystash. *See Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998); *Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996).

### E.

The final issue on which Prystash seeks a COA relates to the fact that he did not pull the trigger in Farah's murder. When a defendant is sentenced to death, the punishment must have been "tailored to his personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). In order to guard against the possibility that a defendant would receive the death sentence on the basis of the culpability of his accomplices, Texas adopted its anti-parties instruction to be used during sentencing. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b) ("[T]he court shall submit the following issues to the jury . . . in cases in which the jury charge at the guilt or innocence stage

15

No. 16-70014

permitted the jury to find the defendant guilty as a party[:] whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."). Texas convicted Prystash of capital murder as a party—someone who "acting with intent to promote or assist the commission of the offense . . . solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE § 7.02(a)(2). When a defendant is convicted of capital murder as a party during the guilt/innocence phase of his trial, the purpose of an anti-parties instruction is to limit the jury's attention during the sentence phase to the personal responsibility and moral guilt of the defendant.

At trial, Prystash successfully asked that the court not include the anti-parties instruction, asserting that it was unconstitutional. *Prystash v. State*, 3 S.W.3d 522, 529–30 (Tex. Crim. App. 1999). On direct appeal, Prystash reversed course and claimed that not giving the anti-parties instruction was error. *Id.* at 530. The Court of Criminal Appeals held that Prystash had invited the error and denied relief. *Id.* at 532. The district court found that this ruling was a state procedural bar to federal habeas relief.

Prystash now argues that the invited error doctrine cannot procedurally bar his habeas petition because it was not firmly established that the doctrine applied to the special issue at the time of his appeal. *See Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (rule of state procedure that disposes of a constitutional claim must be firmly established and regularly followed). He points out that the Court of Criminal Appeals overruled its prior decision in *Powell*, which had held that a defendant could appeal an erroneous special instruction even when he had requested it at his capital trial. *See Prystash*, 3 S.W.3d at 530–32.

16

No. 16-70014

But regardless whether the district court's application of a procedural bar is debatable, the district court also found that the special issue claim fails on the merits. It relied on our prior decisions to the effect that more general special issues, necessary conclusions of the jury at the guilt–innocence phase, and arguments by the parties allow the jury to consider the fact that a defendant was not the triggerman. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1267–68 (5th Cir. 1995).

In his application for a COA, Prystash does not list the district court's merits ruling as one of the issues he seeks to appeal. *See* 28 U.S.C. § 2253(c)(3) ("The certificate of appealability . . . shall indicate which specific issue or issues satisfy the [required] showing . . . ."). Nor does his briefing address the merits though his counsel discussed that at argument. This failure to adequately challenge one of the grounds the district court relied on in rejecting this claim renders the request for a COA on the procedural question moot. *See Blue v. Thaler*, 665 F.3d 647, 662 (5th Cir. 2011); *Phelps v. Alameda*, 366 F.3d 722, 730 (9th Cir. 2004); *Kaminski v. United States*, 339 F.3d 84, 85 n.1 (2d Cir. 2003). Were we to grant the COA and review the district court's finding on the state procedural bar, we would be issuing an advisory opinion as the lack of a COA challenging the district court's merits ruling would render us powerless to grant Prystash relief.[7]

---

[7] Circuit law, in any event, supports the district court's merits ruling. "[T]he law of this circuit [is] that a jury need only be provided one fair vehicle for considering mitigating evidence." *Harris v. Collins*, 990 F.2d 185, 189 (5th Cir. 1993). In Prystash's case, the jury was instructed with Texas's special issue on future dangerousness. *See Nichols*, 69 F.3d at 1267 (finding that Texas's special issue on future dangerousness allowed jury to give a mitigating effect to the petitioner's nontriggerman status). At oral argument, counsel for Prystash asserted that the instructions given in *Nichols* were different than those at Prystash's trial. This is true; there were special issues included at Nichols's trial that were absent at Prystash's, but the issue concerning future dangerousness that the *Nichols* court called adequate was present in both. *Cf. id.* at 1261 n.6.

17

No. 16-70014

\* \* \*

The application for a certificate of appealability is DENIED.



Certified as a true copy and issued
as the mandate on **Apr 26, 2017**

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

# *United States Court of Appeals*
**FIFTH CIRCUIT**
OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

April 26, 2017

Mr. David J. Bradley
Southern District of Texas, Houston
United States District Court
515 Rusk Street
Room 5300
Houston, TX 77002

      No. 16-70014    Joseph Prystash v. Lorie Davis, Director
                            USDC No. 4:05-CV-1546

Dear Mr. Bradley,

Enclosed is a certified copy of an opinion-order entered on April 26, 2017. We have closed the case in this court.

We are not forwarding the record on appeal as it is an electronic copy.

                                        Sincerely,

                                        LYLE W. CAYCE, Clerk

                                        By: _____
                                        Jamei R. Schaeffer, Deputy Clerk

Enclosure(s)

cc:
      Mr. Travis Golden Bragg
      Mr. David R. Dow
      Mr. Jeffrey R. Newberry
      Ms. Ellen Stewart-Klein